[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
Aug. 6, 2009
THOMAS K. KAHN
CLERK

_____

No. 08-12857

_____

Agency No. A99-639-379

HANI KAZEMZADEH,

Petitioner,

versus

U.S. ATTORNEY GENERAL,

Respondent.


_____

Petition for Review of a Decision of the
Board of Immigration Appeals

_____

(August 6, 2009)

Before MARCUS and PRYOR, Circuit Judges, and EDENFIELD,* District Judge.

_____

      * Honorable B. Avant Edenfield, United States District Judge for the Southern District of Georgia, sitting by designation.

PRYOR, Circuit Judge:

This petition for review, filed by an Iranian who has converted from Islam to Christianity and claims to fear persecution in Iran where apostasy is punishable by death, places this Court between Scylla and Charybdis. A denial of review will return the petitioner to the theocratic regime in Iran, but an erroneous grant of review could establish a precedent that rewards less than genuine fears of persecution based on religious conversion. Hani Kazemzadeh, a native and citizen of Iran, petitions this Court for review of the denial of his application for asylum and withholding of removal based on political and religious persecution. The main issue presented is whether the Immigration Judge and the Board of Immigration Appeals gave reasoned consideration to Kazemzadeh's evidence that he has a well-founded fear of persecution based on his conversion to Christianity while in the United States.

The right course between the threats of Scylla and Charybdis is for the Board to reconsider the record, which contains important evidence that the Board failed to mention. Although substantial evidence supports the decision of the Board that Kazemzadeh failed to prove a well-founded fear of persecution based on his political opinion, the Board failed to give reasoned consideration to Kazemzadeh's evidence of a well-founded fear of persecution based on his

2

religion. There is evidence that the law against apostasy is not often enforced in Iran, but neither the Board nor the Immigration Judge considered Kazemzadeh's testimony that Iranians who convert from Islam to Christianity avoid punishment by instead suffering persecution by practicing underground. The Board and the Immigration Judge also failed to consider whether the Iranian regime has a heightened interest in Kazemzadeh that makes it more likely that Kazemzadeh's conversion will be discovered. We deny Kazemzadeh's petition about political persecution, and we grant Kazemzadeh's petition about religious persecution, vacate the decision of the Board about that claim, and remand for further proceedings consistent with this opinion.

## I. BACKGROUND

Our discussion of the background of this petition is divided in three parts. We first discuss Kazemzadeh's entrance to the United States and his application for asylum and withholding of removal. We next discuss Kazemzadeh's removal hearing and the decision of the Immigration Judge. We then discuss Kazemzadeh's appeal to the Board and its decision.

*A.  Kazemzadeh's Entrance to the United States and Application for Asylum and Withholding of Removal*

Kazemzadeh entered the United States on April 7, 2005, as a nonimmigrant visitor entitled to remain in the country until October 6, 2005.  Kazemzadeh stayed in the United States longer than permitted.  On March 20, 2006, Kazemzadeh applied for asylum, 8 U.S.C. § 1158(a)(1), and withholding of removal, id. § 1231(b)(3), based on religion, political opinion, and membership in a particular social group, and he sought relief under the Convention Against Torture, 8 C.F.R. § 208.16(c)(2).

In his application, Kazemzadeh stated that, while attending a university in Iran in August 2003, he "became involved in the student group opposed to the government of Iran."  He said that he "helped organize and participated in several student demonstrations during this time" and "spoke openly about freedom of religion."  Kazemzadeh stated that he was arrested and detained for several days after he participated in a large demonstration on July 10, 2004.  Kazemzadeh alleged that he was interrogated, beaten, tortured, and denied access to his family and an attorney.  Kazemzadeh stated that after his release he was monitored by Iranian authorities and the discipline committee of the university.  Kazemzadeh alleged that in October 2004 he was summoned to appear before the committee,

4

did not appear because he feared arrest, and stopped attending the university. Kazemzadeh alleged that he was notified in December 2004 that he had been expelled from the university.

Kazemzadeh also stated that in January 2005 he traveled to Germany to apply for a United States visa. Kazemzadeh stated that he returned to Iran later that month and "kept a low profile," "sometimes sleep[ing] at friends' and other relatives' homes." Kazemzadeh alleged that in April 2005 he received "a Subpeona [sic] to appear in Court on June 1, 2005." According to Kazemzadeh, he then decided "to leave Iran for a while to see if things would get better."

Kazemzadeh alleged that, after he left Iran for the second time, he "was convicted of being an Agitator against the Islamic Republic of Iran and sentenced to 6 years in prison." Kazemzadeh also stated in his application that in 1987 his father "was accused of being active with an anti-revolutionary group advocating against the government and against the islamic religion." His father "was found guilty and was expelled from the public education system and from all government jobs for life."

Kazemzadeh submitted several documents with his application: (1) an undated letter from Jose David Lopez, associate pastor at West Kendall Baptist Church in Miami, Florida, which confirmed Kazemzadeh's conversion to

5

Christianity while in the United States; (2) a letter dated January 23, 2006, from Rob Myers, senior pastor at West Kendall, which confirmed that Kazemzadeh began visiting West Kendall in September 2005, was baptized on November 6, 2005, and remained a "member in good standing" after his baptism; (3) a certificate of Kazemzadeh's baptism at West Kendall on November 6, 2005; (4) two letters that summoned Kazemzadeh to appear before the discipline committee of the Iranian university, dated October 24, 2004, and November 24, 2004, respectively; (5) a letter dated December 29, 2004, from the discipline committee to Kazemzadeh, which stated that he had been expelled from the university; (6) a complaint dated January 7, 2005, filed against Kazemzadeh by the committee; (7) a letter dated April 4, 2005, from the Ministry of Justice of Iran that commanded Kazemzadeh to appear in court on June 1, 2005; (8) a default judgment dated August 14, 2005, which sentenced Kazemzadeh to six years in prison; (9) a petition signed by several "resident[s] of Bagh Flahat, Restaurant Mizban Street," which confirmed Kazemzadeh's arrest on July 10, 2004, and the harassment by the authorities that followed; and (10) various forms of government-issued identification.

After an asylum officer interviewed Kazemzadeh and declined to grant him asylum, the Immigration and Naturalization Service charged him with

6

removability, 8 U.S.C. § 1227(a)(1)(B), and ordered him to appear at a removal hearing. Kazemzadeh appeared with counsel. Kazemzadeh admitted the allegations in the notice to appear, conceded removability, and renewed his requests for asylum, withholding of removal, and relief under the Convention Against Torture.

B. *Kazemzadeh's Removal Hearing and the Decision of the Immigration Judge*

On October 12, 2006, Kazemzadeh appeared with counsel at the removal hearing. The Immigration Judge admitted three exhibits at the hearing: (1) the notice to appear; (2) Kazemzadeh's application for asylum and withholding of removal, with all attached documents; and (3) the 2005 country report for Iran published by the State Department. The government objected to the documents attached to Kazemzadeh's application on the ground that the documents were not authenticated, and the Immigration Judge noted the objection. The Immigration Judge heard testimony from Kazemzadeh and Pastor Lopez.

Kazemzadeh initially testified about his political activities in Iran. Kazemzadeh testified that one month after he began attending a university in Bushehr, Iran, in 2003, he and two friends organized a weekly discussion group of about 50 students. He later testified that he had organized the group before entering the university. Kazemzadeh stated that the main concern of the group

7

was "freedom, freedom of the expression and freedom of religion and also there was some other fact like poverty and other stuff." Kazemzadeh testified that he "grew up in a political family because [his] father was from the childhood always was interested in politics[,]" but that he was not active politically before entering the university.

Kazemzadeh testified that he participated in three demonstrations in Iran. The first demonstration was in Tehran in 2003 and was attended by "more then 500 students." Kazemzadeh testified that the first demonstration was peaceful, but that the "Bashigis Islamic government" would try to stop the demonstrations and the police would use batons, fire hoses, and gas. The second demonstration was in Tehran in spring 2004 and was attended by about 500 to 600 students. The third demonstration was at the university Kazemzadeh attended in Bushehr in July 2004 and was attended by 150 students. That demonstration commemorated the arrest of another student.

Kazemzadeh testified that he and three other students were arrested when the police used batons and gas to stop the third demonstration. The police took Kazemzadeh and the other three students by car to a prison, where they were placed in separate rooms. Kazemzadeh testified that he was then beaten and questioned about his discussion group for five hours. Kazemzadeh testified that

8

the police used their hands and electric wire to beat him and beat him on his knees to hide his bruises. Kazemzadeh testified that he was detained for four days. Kazemzadeh testified that, after his release from prison, the authorities came to his home, questioned him, and monitored his contact with student groups.

Kazemzadeh testified that, when he returned to the university in October 2004, he received a letter that summoned his appearance before the discipline committee. Kazemzadeh testified that he did not appear before the discipline committee because he "was afraid to be arrested again" and instead left the university. Kazemzadeh testified that he received two more letters from the committee after he left the university. The first letter again summoned Kazemzadeh to appear before the committee, and the second letter informed Kazemzadeh that he had been expelled from the university for "not following the Islamic tradition[.]"

Kazemzadeh testified that he decided to travel after he received the expulsion letter because he "felt [his] situation [was] getting dangerous in Iran[.]" Kazemzadeh traveled to Germany, where he interviewed at the United States consulate to apply for a visa. The consulate official told Kazemzadeh that it would take 40 days to conduct a background check and issue him a visa. Kazemzadeh returned to Iran after his visa to stay in Germany expired.

Kazemzadeh testified he did not apply for asylum in Germany because he had "two uncle[s] in the United States" where he had better opportunities. Kazemzadeh testified that he stayed with friends, instead of his parents, when he returned to Iran because he "was afraid to get arrested." The authorities "contact[ed] [his] home and they questioned [his] parents." The authorities also sent Kazemzadeh a letter "inviting [him] to the Islamic republic court[,]" but Kazemzadeh failed to appear. Kazemzadeh testified that in April 2005 he was notified that his visa was ready. Two weeks later, and three days after receiving the letter about the court appearance, Kazemzadeh traveled to Germany and then to the United States.

Kazemzadeh testified that after he left Iran he was sentenced in absentia to six years of imprisonment for his participation in antigovernment activities. Kazemzadeh testified that he did not know what happened to the three other students who were arrested at the demonstration. Kazemzadeh testified that he had not been in contact with them because "[f]or their sake it's not good for me to contact them." Kazemzadeh testified that he had been in contact with his parents, but that his parents are afraid to use the telephone.

Kazemzadeh testified that he did not intend to apply for asylum upon arriving in the United States. Kazemzadeh testified that he would be arrested and

10

imprisoned, on account of his political activities, if he returned to Iran. When asked by the Immigration Judge why the authorities would arrest him now, despite failing to do so when he returned from Germany, Kazemzadeh explained "[b]ecause all these things happened before the court ordered, sentenced me to jail."

Kazemzadeh testified that his father had been a high school philosophy teacher, but was no longer allowed to hold a government position because he was involved with an "anti-government group" and "tried to convince the other students to follow his ideal." Kazemzadeh testified that in 1988 the Iranian government arrested his father, detained him for five days, tried and convicted him in absentia upon his release, discharged him from his teaching position, and barred him from future government employment. Kazemzadeh also testified that his only sibling, a brother who lived in Tehran, was unable to work because of his father's activities.

Kazemzadeh also testified about his religious conversion. Kazemzadeh testified that he was born a Muslim, but converted to Christianity in November 2005, while in the United States. His friend, Fahr Naghib, introduced Kazemzadeh to the West Kendall Baptist Church, which was only a five-minute walk from his house. Naghib had joined that church after converting to

11

Christianity from Islam. Kazemzadeh testified that the "peaceful aspect of Christianity" attracted him. Kazemzadeh testified that he was baptized on November 5, 2005, and that he had attended Tuesday Bible study classes on ten occasions.

Kazemzadeh testified that he had told his uncle about his conversion and his uncle was unconcerned, but Kazemzadeh had not told his parents. Kazemzadeh testified that his mother might be upset by his conversion, but that "it's not important for [his] dad." Kazemzadeh testified that Iranians born in the Christian faith practice their religion openly, but that Iranians who convert from Islam to Christianity "practice underground." According to Kazemzadeh, he would be executed if he returned to Iran and the authorities learned of his conversion.

Pastor Lopez initially testified that he met Kazemzadeh about "7 to 8 months" before Kazemzadeh's asylum hearing and knew Kazemzadeh for about one or two months before baptizing him. When told on cross-examination that Kazemzadeh had allegedly been baptized on November 6, 2005, which was 11 months before his hearing, Pastor Lopez testified that he met Kazemzadeh about one year before the hearing. Pastor Lopez testified that, after meeting Kazemzadeh, he was "one of the one's who shared the gospel with [Kazemzadeh] and . . . one of the one's who initially heard him respond towards Christianity."

12

Pastor Lopez testified that he was "[i]nitially . . . a bit skeptical" about Kazemzadeh's interest in Christianity "because of his background" and the suddenness of his interest, but he later believed Kazemzadeh's conversion was sincere.

When asked how often Kazemzadeh attended services on Sundays and Bible study on Tuesdays, Pastor Lopez testified, "In the last year, since I've known, I would say 3 out of 4 Sundays a month he's there, and in home groups, you know, 3 out of 4 weeks he's there." When told that Kazemzadeh testified that he had only attended ten Tuesday Bible study classes, Pastor Lopez explained, "Like I said I just made an assumption [about Kazemzadeh's attendance] because I'm not his home group leader." Pastor Lopez testified that Kazemzadeh had helped with community service activities of the church.

The 2005 country report for the "Islamic Republic of Iran" published by the State Department stated that the population of Iran is "approximately 68 million" and "is approximately 99 percent Muslim." The report stated that the "Baha'i, Christian, Zoroastrian, and Jewish communities constituted less than 1 percent of the population." The report stated that "[i]n 2001 the [United Nations Special Representative for Iran of the Commission on Human Rights] estimated the Christian community at approximately 300 thousand," and that "[s]ome unofficial

13

estimates indicated that there were approximately 100 thousand Muslim-born citizens who converted to Christianity." The report stated that "[a]postasy, specifically conversion from Islam, is punishable by death," but that "there were no reported instances of the death penalty being applied for apostasy during the year." The report stated that there was one "unconfirmed report on Christian Web sites that on November 22, unidentified persons killed a man who had converted to Christianity more than 10 years earlier." The report also stated that, on December 19, a Baha'i apostate, who "was arrested in 1995 and faced a life sentence for apostasy," "died in prison of unknown causes." "Two other Baha'is were in prison at year's end, including [one] who . . . was sentenced to three years in prison for activities against the security of the state and spreading falsehoods."

The Immigration Judge denied Kazemzadeh's application and ordered him removed to Iran. The Immigration Judge found that Kazemzadeh's testimony about his fear of persecution on account of his political opinion "was not sufficiently detailed and was too general in nature to provide a plausible and coherent account of the basis for his fears and cannot suffice to establish his eligibility for asylum." The Immigration Judge credited the testimony of Kazemzadeh and Pastor Lopez that Kazemzadeh had converted to Christianity, but the Immigration Judge found that Kazemzadeh failed to establish a well-founded

14

fear of persecution on account of his religion. The Immigration Judge found that Kazemzadeh failed to prove "that the extent of his involvement [with Christianity] would create a likelihood that he would be identified as a convert and that he would be punished as such." The Immigration Judge did not discuss Kazemzadeh's testimony that Iranians who convert from Islam to Christianity practice underground, and the Immigration Judge did not discuss Kazemzadeh's earlier encounters with the Iranian regime in reference to the potential discovery of his religious conversion.

## C. Kazemzadeh's Appeal to the Board

The Board dismissed Kazemzadeh's appeal on the ground that he failed to establish eligibility for asylum or withholding of removal. The Board ruled that Kazemzadeh failed to establish that he was persecuted on account of his political opinion because he "failed to allege that he suffered any specific harm" as a result of his arrest, interrogation, beating, and detention. The Board also ruled that Kazemzadeh failed to establish that he has a well-founded fear of persecution on account of his political opinion because he returned to Iran from Germany without incident before later traveling to the United States and he did not authenticate documents to establish that he was convicted in absentia and sentenced to six years in prison after he left Iran.

15

The Board agreed with the finding of the Immigration Judge that Kazemzadeh failed to establish that he has a well-founded fear of persecution on account of his religion because he did not prove that anyone in Iran is aware of his conversion to Christianity. The Board stated, "To the extent that [Kazemzadeh] argues on appeal that there is a pattern or practice of persecution in Iran against people who convert to Christianity, we find that [Kazemzadeh] failed to establish that such a pattern or practice exists . . . ." The Board did not discuss Kazemzadeh's testimony that Iranians who convert from Islam to Christianity practice underground, and the Board also did not discuss Kazemzadeh's personal encounters with the Iranian regime in reference to the potential discovery of his religious conversion.

## II. STANDARDS OF REVIEW

"We review the decision of the Board, and we review the decision of the Immigration Judge to the extent that the Board expressly adopted the opinion of the Immigration Judge." Mohammed v. U.S. Att'y Gen., 547 F.3d 1340, 1344 (11th Cir. 2008) (citation omitted). Because the Board agreed with the finding of the Immigration Judge that Kazemzadeh failed to establish a well-founded fear of persecution on account of his religion, we review the decisions of both the Immigration Judge and the Board about that issue. Id. We review de novo the

16

conclusions of law by the Board and Immigration Judge, but we review findings of fact for substantial evidence to support them.  Al Najjar v. Ashcroft, 257 F.3d 1262, 1283–84 (11th Cir. 2001).

Our review for substantial evidence is highly deferential.  Id. at 1284. "[W]e view the record evidence in the light most favorable to the agency's decision and draw all reasonable inferences in favor of that decision."  Adefemi v. Ashcroft, 386 F.3d 1022, 1027 (11th Cir. 2004) (en banc).  We may not "re-weigh the evidence from scratch."  Mazariegos v. U.S. Att'y Gen., 241 F.3d 1320, 1323 (11th Cir. 2001) (internal quotation marks omitted).  We "must affirm the [decision of the Board] if it is supported by reasonable, substantial, and probative evidence on the record considered as a whole."  Al Najjar, 257 F.3d at 1284 (internal quotation marks omitted).  "To reverse [factual findings by the Board], we must find that the record not only supports reversal, but compels it."  Mendoza v. U.S. Att'y Gen., 327 F.3d 1283, 1287 (11th Cir. 2003).  "[T]he mere fact that the record may support a contrary conclusion is not enough to justify a reversal of the administrative findings."  Adefemi, 386 F.3d at 1027.

The Board and the Immigration Judge "must consider all evidence introduced by the applicant."  Tan v. U.S. Att'y Gen., 446 F.3d 1369, 1374 (11th Cir. 2006) (internal quotation marks omitted); see 8 C.F.R. §1240.1(c) ("The

17

immigration judge shall receive and consider material and relevant evidence . . . ."). "'Where . . . the [Immigration Judge] has given reasoned consideration to the petition, and made adequate findings, we will not require that it address specifically each claim the petitioner made or each piece of evidence the petitioner presented.'" Tan, 446 F.3d at 1374 (quoting Morales v. I.N.S., 208 F.3d 323, 328 (1st Cir. 2000)). "The Immigration Judge must consider the issues raised and announce its decision in terms sufficient to enable a reviewing court to perceive that it has heard and thought and not merely reacted." Id. (internal quotation marks omitted).

### III.  DISCUSSION

The Immigration and Nationality Act gives the Attorney General discretion to grant asylum to any alien determined to be a "refugee" within the meaning of the Act.  8 U.S.C. § 1158(b)(1)(A).  "A refugee is defined as one who is unable or unwilling to return to his or her home country 'because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion.'" Yang v. U.S. Att'y Gen., 418 F.3d 1198, 1202 (11th Cir. 2005) (quoting 8 U.S.C. § 1101(a)(42)(A)).  "The burden of proof is on the applicant to establish that the applicant is a refugee."  8 U.S.C. § 1158(b)(1)(B)(i).

18

"To establish asylum based on past persecution, the applicant must prove (1) that []he was persecuted, and (2) that the persecution was on account of a protected ground." Silva v. U.S. Att'y Gen., 448 F.3d 1229, 1236 (11th Cir. 2006); see also 8 C.F.R. § 208.13(b). "An applicant who has been found to have established such past persecution shall also be presumed to have a well-founded fear of persecution on the basis of the original claim." 8 C.F.R. § 208.13(b)(1). That presumption may be rebutted if an asylum officer or immigration judge makes either of two findings: (1) that "[t]here has been a fundamental change in circumstances such that the applicant no longer has a well-founded fear of persecution"; or (2) "[t]he applicant could avoid future persecution by relocating to another part of the applicant's country of nationality . . . and under all the circumstances, it would be reasonable to expect the applicant to do so." Id. § 208.13(b)(1)(i)(A) & (B). The government bears the burden of establishing by a preponderance of the evidence either changed circumstances or the ability to avoid persecution by relocating. Id. § 208.13(b)(1)(ii).

An applicant may also establish a well-founded fear of persecution without proving past persecution. Id. § 208.13(b)(2). To do so, an applicant must establish a fear of persecution in his country of nationality on account of a protected ground, a "reasonable possibility" of suffering persecution if the

19

applicant returns to that country, and that he is unable or unwilling to return because of his fear. Id. § 208.13(b)(2)(i). The applicant's fear of persecution must be "subjectively genuine and objectively reasonable." Al Najjar, 257 F.3d at 1289. The applicant need not establish a reasonable possibility of persecution if the applicant instead proves that he is a member of, or is identified with, a group that is subjected to a "pattern or practice" of persecution in his country of nationality. 8 C.F.R. § 208.13(b)(2)(iii). "An applicant does not have a well-founded fear of persecution if the applicant could avoid future persecution by relocating to another part of the applicant's country of nationality . . . if under all the circumstances, it would be reasonable to expect the applicant to do so." Id. § 208.13(b)(2)(ii). The applicant bears the burden of proving that it would not be reasonable for him to relocate, "unless the persecution is by a government or is government-sponsored," id. § 208.13(b)(3)(i), in which case relocation is presumed to be unreasonable "unless the [government] establishes by a preponderance of the evidence that, under all the circumstances, it would be reasonable for the applicant to relocate." Id. § 208.13(b)(3)(ii). "Where an applicant is unable to meet the 'well-founded fear' standard of asylum, he is generally precluded from qualifying for either asylum or withholding of [removal]." Al Najjar, 257 F.3d at 1292–93 (some internal quotation marks omitted).

Our discussion of the merits of Kazemzadeh's petition is divided in two parts. We first discuss Kazemzadeh's argument that he suffered political persecution and has a well-founded fear of political persecution. We then discuss Kazemzadeh's argument that he has a well-founded fear of religious persecution. Kazemzadeh makes only a passing reference in his brief to his application for relief under the Convention Against Torture, so that issue is abandoned. See Sepulveda v. U.S. Att'y Gen., 401 F.3d 1226, 1228 n.2 (11th Cir. 2005); Greenbriar, Ltd. v. City of Alabaster, 881 F.2d 1570, 1573 n.6 (11th Cir. 1989).

*A. The Record Does Not Compel the Finding that Kazemzadeh Suffered Political Persecution or Has a Well-Founded Fear of Political Persecution.*

Kazemzadeh argues that he suffered political persecution in Iran and has a well-founded fear of political persecution upon his return to Iran. We disagree. We address each argument in turn.

Kazemzadeh first argues that his evidence of his arrest, interrogation, beating, detention, and harassment established that he had been persecuted on account of his political opinion, but this argument fails. Substantial evidence supports the finding of the Board that Kazemzadeh "failed to establish that these incidents, whether considered individually or cumulatively, rise to the level of past persecution." "'[P]ersecution' is an extreme concept, requiring more than a few

21

isolated incidents of verbal harassment or intimidation, and . . . mere harassment does not amount to persecution." Sepulveda, 401 F.3d at 1231 (internal quotation marks omitted). Minor physical abuse and brief detentions do not amount to persecution. In Djonda v. United States Attorney General, 514 F.3d 1168, 1171, 1174 (11th Cir. 2008), for example, we ruled that evidence that an alien had been detained for 36 hours, beaten by police officers, and suffered only scratches and bruises did not compel a finding that the alien had been persecuted. In Zheng v. United States Attorney General, 451 F.3d 1287, 1290–91 (11th Cir. 2006), we ruled that evidence that an alien had been detained for five days, forced to watch reeducation videos, stand in the sun for two hours, and sign a pledge to no longer practice his religion also did not compel a finding that the alien had been persecuted.

The record does not compel a finding that Kazemzadeh was persecuted. Kazemzadeh testified that he was arrested while participating in a student demonstration, interrogated and beaten for five hours, and detained for four days, but Kazemzadeh did not prove that he suffered any physical harm. Kazemzadeh also testified that after his release he was monitored by Iranian authorities and summoned to appear before both the discipline committee of the university he

22

attended and the "Islamic republic court[,]" but the record does not compel the finding that these incidents were anything more than harassment.

Kazemzadeh argues that "[a]s soon as he steps foot in Iran, he will be taken into custody and once again subjected to horrible detention conditions including beatings such as he experienced in the past[,]" but the record does not compel that finding. Kazemzadeh's testimony that he chose not to apply for asylum in Germany, returned to Iran from Germany without incident before later traveling to the United States, and did not intend to apply for asylum when he arrived in the United States supports the finding that Kazemzadeh failed to prove a well-founded fear of persecution on account of his political opinion. See De Santamaria v. U.S. Att'y Gen., 525 F.3d 999, 1011 (11th Cir. 2008). Kazemzadeh produced documentary evidence that he had been convicted in absentia and sentenced to six years of imprisonment, but the documents did not state the reason for his conviction. The Board was entitled to discount the evidence because the documents had not been authenticated. Yang, 418 F.3d at 1202 n.3.

*B. The Board Failed To Give Reasoned Consideration to Kazemzadeh's Claim of a Well-Founded Fear of Religious Persecution.*

The closer issue presented by Kazemzadeh's petition is whether he has a well-founded fear of persecution based on his religious conversion. The Board

23

found that Kazemzadeh's conversion to Christianity is genuine, and it is undisputed that apostasy is a capital offense in Iran. Kazemzadeh's petition depends on whether the record compels a finding of a reasonable possibility that he will be persecuted for being a convert.

At oral argument, counsel for the Attorney General contended that the record allows an inference that Kazemzadeh will not practice Christianity when he returns to Iran, but we disagree. There is no evidence that Kazemzadeh will cease practicing Christianity in Iran. Neither the Board nor the Immigration Judge discredited Kazemzadeh's testimony or other evidence about his conversion, which means that we will not allow the government to suggest now that Kazemzadeh's conversion is less than credible. "Where an [Immigration Judge] fails to explicitly find an applicant's testimony incredible and cogently explain his or her reasons for doing so, we accept the applicant's testimony as credible." De Santamaria, 525 F.3d at 1011 n.10; see also Mejia v. U.S. Att'y Gen., 498 F.3d 1253, 1257 (11th Cir. 2007) ("The [Immigration Judge] did not [make an adverse credibility finding] here, and thus we accept Mejia's testimony as credible.").

When the Board ruled that Kazemzadeh failed to prove that there is a pattern or practice of persecution in Iran against Muslims who convert to Christianity, the Board was "entitled to rely heavily on" the 2005 country report

for Iran published by the State Department. Reyes-Sanchez v. U.S. Att'y Gen., 369 F.3d 1239, 1243 (11th Cir. 2004). The report stated that "[s]ome unofficial estimates indicated that there were approximately 100 thousand Muslim-born citizens who converted to Christianity," but that "there were no reported instances of the death penalty being applied for apostasy during the year." There was one "unconfirmed report on Christian Web sites that on November 22, unidentified persons killed a man who had converted to Christianity more than 10 years earlier." The report also stated that, on December 19, a Baha'i apostate, who "was arrested in 1995 and faced a life sentence for apostasy," "died in prison of unknown causes" and that "[t]wo other Baha'is were in prison at year's end, including [one] who . . . . was sentenced to three years in prison for activities against the security of the state and spreading falsehoods." If the record contained only this evidence of religious persecution, then we would be hard-pressed to overturn the decision of the Board that Kazemzadeh failed to prove a pattern or practice of religious persecution.

The problem with the decision of the Board is that it failed to consider two important aspects of the record. Kazemzadeh offered evidence about religious persecution and his personal encounters with the Iranian regime that neither the Board nor the Immigration Judge mentioned in reference to Kazemzadeh's

25

conversion. As a result, the Board did not give "reasoned consideration" to Kazemzadeh's application or make "adequate findings." Tan, 446 F.3d at 1375 (internal quotation marks omitted).

First, neither the Board nor the Immigration Judge considered Kazemzadeh's testimony that Iranians who convert from Islam to Christianity "practice underground." We agree with the decision of the Seventh Circuit that having to practice religion underground to avoid punishment is itself a form of persecution. See Muhur v. Ashcroft, 355 F.3d 958, 960–61 (7th Cir. 2004) (Posner, J.). We have recognized that "the [Immigration and Nationality Act] and related regulations . . . do not require applicants . . . to avoid signaling to others that they are indeed members of a particular race, or adherents of a certain religion, etc." Antipova v. U.S. Att'y Gen., 392 F.3d 1259, 1264–65 (11th Cir. 2004). The Board relied on the 2005 country report to find that Kazemzadeh failed to prove that the law against apostasy is often enforced, but the Board did not consider whether enforcement is rare because apostates practice underground and suffer instead that form of persecution to avoid detection and punishment. We are unpersuaded by the dissent that "the necessity of practicing underground is not of concern in this case" because "[i]t seems implausible that the near-total absence of documented persecution of apostates in Iran is due simply to the fact that the

26

100,000 Christian converts are able to keep their Christianity under wraps." The unofficial estimate of 100,000 Christian converts in Iran represents only 0.147 percent of the total population of Iran in 2005. We cannot say that it is implausible that such a small minority would be able to avoid punishment by concealing their religion.

Second, although the Board is correct that there is no evidence that anyone in Iran knows about Kazemzadeh's conversion, neither the Board nor the Immigration Judge considered whether Kazemzadeh is a person about whom the Iranian regime already has a heightened interest. Kazemzadeh testified that when he was in Iran he was arrested, detained, beaten, and monitored because of his political activities. Kazemzadeh also testified that he was expelled from the university he attended in Iran "for not following the Islamic tradition" and was sentenced in absentia after he left Iran to six years of imprisonment for his participation in antigovernment activities. Kazemzadeh testified that his father had been a high school philosophy teacher, but was no longer allowed to hold a government position because he was involved with an "anti-government group" and "tried to convince the other students to follow his ideal." Kazemzadeh testified that in 1988 the Iranian government arrested his father, detained him for five days, tried and convicted him in absentia upon his release, discharged him

27

from his teaching position, and barred him from future government employment. Kazemzadeh also testified that his sibling was unable to work because of his father's activities. The Board and the Immigration Judge considered this evidence with reference to Kazemzadeh's application based on political persecution, but this evidence was also relevant to Kazemzadeh's application for asylum based on religious persecution. Neither the Board nor the Immigration Judge mentioned whether the evidence that Kazemzadeh is a person about whom the Iranian regime already has a heightened interest makes it more likely that Kazemzadeh's religious conversion will be discovered and become a basis for persecution should he return to Iran.

The dissent argues that our decision to remand so the Board can consider these aspects of the record "is contrary to the deference we traditionally afford Immigration Courts in reaching the ultimate decision," but we disagree. Although the dissent states that "we typically do not require Immigration Judges or the Board to explicitly address every particular consideration in their opinions," a remand is necessary when the record suggests that the Board failed to consider important evidence in that record. Tan, 446 F.3d at 1374. That is the case here.

## IV. CONCLUSION

Kazemzadeh's petition for review is **DENIED** in part and **GRANTED** in part. We **DENY** the petition as to Kazemzadeh's claims of persecution and a well-founded fear of persecution based on his political opinion. We **GRANT** the petition as to Kazemzadeh's claim of a well-founded fear of persecution based on his religion, **VACATE** the decision of the Board about that claim, and **REMAND** for further proceedings consistent with this opinion.

MARCUS, Circuit Judge, specially concurring:

I join fully the majority's opinion and agree that the BIA's determination must be vacated and remanded for further fact-finding and explanation of the basis for its decision. The BIA and the IJ concluded that Kazemzadeh failed to establish a well-founded fear of persecution on account of his conversion to Christianity from Islam. In support of this determination, the BIA and the IJ cited only two elements: the fact that no one in Iran, including Kazemzadeh's parents, was yet aware of the petitioner's conversion; and the Iran Country Report on Human Rights Practices – 2005 ("State Department Report"), although they did not explain which part of the lengthy report they found pertinent. On this scant record, we cannot conduct meaningful appellate review of the BIA's determination.

At oral argument and in their appellate brief, the government said that Kazemzadeh had not shown "that his commitment to the religion" indicated he would practice in a way that would come to the attention of the authorities. To the extent the BIA's decision turns in any way on the idea that Kazemzadeh could avoid persecution by abandoning his faith, that is not an acceptable consideration. And, to the extent that its decision turns on the suggestion that Kazemzadeh could practice his Christian faith "underground," and thereby elude discovery, that too may not be factored into the calculus of risk associated with a well-founded fear analysis. As I

see it, the requirement that an asylum petitioner abandon his faith, or practice only in the dead of night, amounts to religious persecution.

I write separately to underscore these points. First, it is legal error to deny asylum on the basis of well-founded fear of religious persecution on the theory that an individual may escape discovery by abandoning his faith or hiding it and practicing his religion underground. Second, as I see it, there is a substantial body of undisputed evidence in this record, and never mentioned by the BIA, that supports the objective component of Kazemzadeh's well-founded fear that he could be sanctioned in Iran for apostasy. And, third, this is not a case that presents any palpable risk of admitting any fraudulent claims on the basis of a phony religious conversion because, as the majority opinion points out, both the IJ and BIA necessarily accepted Kazemzadeh's conversion as genuine.

## I.

The BIA concluded that Kazemzadeh "failed to present sufficient testimonial or documentary evidence to establish that a reasonable person in his circumstances would fear persecution upon return to Iran." It is surely true that to satisfy this requirement Kazemzadeh need only demonstrate that there was a "reasonable possibility" of future harm in Iran on the basis of a protected ground. 8 C.F.R. §

208.13(b)(2)(iii); I.N.S. v. Cardoza-Fonseca, 480 U.S. 421, 440 (1987) (explaining that when seeking asylum on account of a fear of future persecution "it need not be shown that the situation will probably result in persecution, but it is enough that persecution is a reasonable possibility."); Mejia v. U.S. Att'y Gen., 498 F.3d 1253, 1256 (11th Cir. 2007) (the petitioner "need only show that there is a reasonable possibility of suffering such persecution if he or she were to return to that country.") (quotation marks, alteration, and citation omitted).

In holding that Kazemzadeh failed to meet this "reasonable possibility" standard, the BIA's rationale is spare and nonspecific. However, in light of its conclusion and the government's argument, it appears that the reasoning goes something like this: while Kazemzadeh is a genuine convert to Christianity, and, while apostasy is a capital offense in Iran, no one in Iran yet knows of his conversion, and, since Kazemzadeh may either cease to practice or, like other Muslim converts to Christianity, practice "secretly" and "underground," the likelihood of discovery is small, and, therefore, the record allows the inference that his fear of persecution is not well-founded. This reasoning turns on the assumption that Kazemzadeh may abandon his faith or practice it underground and thereby elude discovery. The pivotal legal problem with the argument is that it erroneously assumes Kazemzadeh is not entitled to claim asylum on the basis of religious persecution because he can practice his faith

in hiding in order to avoid discovery and the possible penalty of death. In my view, any requirement that Kazemzadeh abandon his faith or practice in secret in order to conceal his conversion amounts to religious persecution under our asylum laws.

There is no universally accepted definition of persecution. The INA is silent on the term's definition. See 8 U.S.C. § 1101(a)(42); see also Gonzalez v. Reno, 212 F.3d 1338, 1355 (11th Cir. 2000). Likewise, the BIA has never defined persecution directly. See Sahi v. Gonzales, 416 F.3d 587, 588-89 (7th Cir. 2005) ("[W]e haven't a clue as to what [the BIA] thinks religious persecution is."). This Court has repeatedly held that "persecution is an extreme concept, requiring more than a few isolated incidents of verbal harassment or intimidation, and that mere harassment does not amount to persecution." Sanchez Jimenez v. U.S. Att'y Gen., 492 F.3d 1223, 1232 (11th Cir. 2007) (quotation marks omitted). As I see it, forcing Kazemzadeh to either renounce his faith or practice it clandestinely, on pain of death, is an "extreme" concept that far exceeds "mere harassment." Indeed, it is a notion that is at war with our case law and with our nation's founding values.

In Antipova v. United States Attorney General, we held that the BIA erred in denying withholding of removal to a Russian national of Jewish faith on the ground that she had "'telegraphed [her] ethnicity or religious affiliation,'" 392 F.3d 1259, 1263 (11th Cir. 2004) (quoting the U.S. Transcript of Pre-decision Discussion with

Counsel). In that case, we rejected the idea that asylum applicants could be required to hide their religion in order to avoid persecution:

> the INA and the related regulations governing withholding of removal do not require applicants who have faced persecution 'on account of race, religion, nationality, membership in a particular social group, or political opinion' to avoid signaling to others that they are indeed members of a particular race, or adherents of a certain religion, etc. Nothing in those regulations supports such a requirement.

Id. at 1264-65.

At least two of our sister circuits have squarely held that to require an individual to hide the exercise of his religion in order to avoid persecution violates our immigration laws. The Seventh Circuit has repeatedly granted asylum on the ground of religious persecution to petitioners who could have avoided punishment for religious "subversiveness" only if they practiced their faith secretly. Iao v. Gonzales, 400 F.3d 530, 532 (7th Cir. 2005) ("She might be able to conceal her adherence to Falun Gong from the authorities, but the fact that a person might avoid persecution through concealment of the activity that places her at risk of being persecuted is [not] inconsistent with her having a well-founded fear of persecution. On the contrary, it is the existence of such a fear that motivates the concealment.") (citations omitted); Muhur v. Ashcroft, 355 F.3d 958, 960-61 (7th Cir. 2004) ("[T]he fatal flaw in the immigration judge's opinion lies . . . in the assumption -- a clear error

34

of law -- that one is not entitled to claim asylum on the basis of religious persecution if (a big if, by the way) one can escape the notice of the persecutors by concealing one's religion. Christians living in the Roman Empire before Constantine made Christianity the empire's official religion faced little risk of being thrown to the lions if they practiced their religion in secret; it doesn't follow that Rome did not persecute the Christians, or that a Christian who failed to conceal his faith would be acting 'unreasonably.' . . . One aim of persecuting a religion is to drive its adherents underground in the hope that their beliefs will not infect the remaining population.") (citations omitted).

Similarly, the Ninth Circuit has held that requiring a petitioner "to practice his beliefs in secret is contrary to our basic principles of religious freedom and the protection of religious refugees." Zhang v. Ashcroft, 388 F.3d 713, 719-20 (9th Cir. 2004). The Eighth Circuit also has suggested that preventing a member of an unpopular religion from practicing could constitute religious persecution. In Woldemichael v. Ashcroft, the court explained that "[a]bsent physical harm, subjecting members of an unpopular faith to hostility, harassment, discrimination, and even economic deprivation is not persecution unless those persons are prevented from practicing their religion or deprived of their freedom." 448 F.3d 1000, 1003 (8th Cir. 2006) (emphasis added).

35

The suggestion that a petitioner seeking asylum on account of religious persecution may be required to practice his faith in the dead of night collides with our nation's ideals about the exercise of religious freedom. The right to practice only surreptitiously and under fear of death is not free exercise. Although I do not presume to superimpose our Free Exercise Clause jurisprudence onto asylum law, the suggestion implicit in the BIA's findings and in the government's argument contradicts both the values of our founders and the values that the drafters of the Refugee Act of 1980, Pub. L. No. 96-212, 94 Stat. 102 (1980) (the "Refugee Act"), embodied when codifying the asylum sections of the INA.

The right to practice one's faith and to do so in public stands at the heart of free exercise. From the earliest constructions of the free exercise of religion, the freedom of open and "visible" worship was the de minimus requirement. See Michael W. McConnell, The Origins and Historical Understanding of Free Exercise of Religion, 103 Harv. L. Rev. 1409, 1459-60 (1990) (quoting W. Penn, The Great Case of Liberty of Conscience, in 1 A Collection of the Works of William Penn 447 (London 1726 and photo. reprint 1974)). The framers of the Constitution worried greatly about religious persecution: "From the outset, the prevention of persecution, penalties, or incapacities on account of religion has served as a common ground among all the various interpretations of religious liberty." Id. at 1474. James Madison defined free

36

exercise as free practice, observing that "[t]he Religion then of every man must be left to the conviction and conscience of every man; and it is the right of every man to exercise it as these may dictate. This right is in its nature an unalienable right." James Madison, Memorial and Remonstrance Against Religious Assessments (1785), in Founding the Republic: A Documentary History 90 (John J. Patrick ed., 1995). Madison kept in clear view the dangers of religious persecution:

> Torrents of blood have been spilt in the old world, by vain attempts of the secular arm, to extinguish Religious discord, by proscribing all difference in Religious opinions. Time has at length revealed the true remedy. Every relaxation of narrow and rigorous policy, wherever it has been tried, has been found to assuage the disease. Id. at 92.

The Supreme Court, relying in no small measure on the writings of James Madison and Thomas Jefferson, defined free exercise in Everson v. Board of Education to mean, among other things, that a state can neither "force nor influence a person to go to or to remain away from church against his will or force him to profess a belief or disbelief in any religion." 330 U.S. 1, 15 (1947).  Similarly, the Court, some forty-six years ago, made it clear that

> [n]othing but the most telling of personal experiences in religious persecution suffered by our forebears could have planted our belief in liberty of religious opinion any more deeply in our heritage . . . . This freedom to worship was indispensable in a country whose people came from the four quarters of the earth and brought with them a diversity of religious opinion.

37

<u>Sch. Dist. of Abington Twp., Pa. v. Schempp</u>, 374 U.S. 203, 214 (1963); <u>see also</u> <u>Johnson v. Robison</u>, 415 U.S. 361, 375 n.14 (1974).

The Supreme Court has consistently regarded the freedom to practice religion openly and notoriously to be at the heart of our government's structure and the founding ideas of free exercise: "The Fathers of the Constitution . . . fashioned a charter of government which envisaged the widest possible toleration of conflicting views. Man's relation to his God was made no concern of the state. He was granted the right to worship as he pleased and to answer to no man for the verity of his religious views." <u>United States v. Ballard</u>, 322 U.S. 78, 87 (1944). The Court has placed this freedom of religious worship beyond the interpretation of governments or courts: "it is no business of courts to say that what is a religious practice or activity for one group is not religion under the protection of the First Amendment." <u>Fowler v. State of R.I.</u>, 345 U.S. 67, 70 (1953) (supporting the right of Jehovah's Witnesses to worship in a public park).

Freedom of religious practice also resonates within the INA's legislative history. The asylum provisions of the INA governing this case were incorporated into law in the Refugee Act, Pub. L. No. 96-212, 94 Stat. 102 (1980). While drafting the Refugee Act, Congress repeatedly referenced the founding legacy of our nation as a powerful motivation for the creation of the statutory scheme protecting asylum

seekers from religious persecution. Thus, for example, Senator Strom Thurmond, in the floor debate, invoked our nation's history as a refuge for those escaping religious persecution, observing that this bill would "tell those who come after us that we were true to our heritage as a people and a Nation . . . ." 125 Cong. Rec. S23231, S23238 (1979); see also 126 Cong. Rec. H4498, H4503 (1980) (statement of Rep. Danielson) ("[T]raditionally, America is the land of people in need, people who are troubled and seek refuge.").

In fact, the Refugee Act was created in no small measure as a response to some of the world's largest contemporary refugee crises; the hearings focused on the need to protect Soviet Jewish refugees, Middle Eastern Christian refugees, and Iranian minorities from religious persecution. U.S. Refugee Programs, Hearing Before the Comm. on the Judiciary, United States Senate, 96th Cong. 4, 7-8, 13 (1980).[1] In my view, the statutory scheme created by Congress to protect asylum-seekers was designed to afford more robust protection to the free exercise of religion than the BIA appears willing to afford Kazemzadeh.

---

[1]See also The Refugee Act of 1979, S. 643: Hearing Before the S. Comm. on the Judiciary, 96th Cong. 8, 10 (1979) (statement of Hon. Dick Clark, U.S. Coordinator for Refugee Affairs); Refugee Act of 1979: Hearings before the Subcomm. on Immigration, Refugees, and International Law of the H. Comm. on the Judiciary, 96th Cong. 74, 77 (1979) (statement of Bernard Manekin, Soviet Jewish Resettlement Program Comm.); Admission of Refugees into the United States: Hearings before the Subcomm. on Immigration, Refugees, and International Law of the Comm. on the Judiciary, H.R., 95th Cong. 15, 52 (1977) (testimony of James Carlin, Deputy Coordinator for Human Rights and Humanitarian Affairs, Department of State).

Neither the founders nor the drafters of the Refugee Act could have accepted the narrow view that secret practice can cure persecution. The apparent view that a petitioner is not entitled to asylum on account of religious persecution so long as he can mitigate the atrocities of his situation by hiding his faith and practicing only in darkness cannot be squared with the asylum statute. Forced clandestine practice amounts to religious persecution all by itself; it should not be the guarantee of safety to which we relegate genuine converts who have attracted the attention of a totalitarian state.

## II.

Once the possibility of practicing underground is eliminated from the calculus of risk, it is likely that the BIA may also have erred as a matter of fact. As I read the record, while it may not compel the conclusion, it does offer substantial evidence that Kazemzadeh has a well-founded fear of persecution on account of his religion. See Adefemi v. Ashcroft, 386 F.3d 1022, 1026-27 (11th Cir. 2004). Again, to prove a well-founded fear, the petitioner must meet here only the standard of "reasonable possibility." Cardoza-Fonseca, 480 U.S. at 440. Although the BIA focused on the present time in finding that "there is no indication that anyone in Iran is aware of the respondent's recent conversion to Christianity," the relevant inquiry is not whether anyone now knows, but whether the record supports the inference that it is

"reasonably possible" that the authorities <u>will</u> know. Powerful record evidence suggests future discovery; as the majority opinion has explained, the BIA must address these undisputed facts on remand, or at least indicate that it has reviewed them.

As I see it, the following circumstances support a finding that Kazemzadeh's apostasy will be discovered by the Iranian government in the future and that, as a result, he will face persecution in Iran on account of his religion: (1) it is undisputed that Kazemzadeh is a genuine apostate and apostasy is a crime punishable by death in Iran; (2) Kazemzadeh regularly practices Christianity, attending two-hour long Sunday worship services three out of four Sundays a month and at least ten two-hour long religious education classes, and we, therefore, have every reason to expect that he will continue to practice his faith; (3) scores of people in the United States know of his "apostasy" and may try to contact him, his family, or the authorities in Iran, including some 1,000 to 1,200 parishioners with whom he attends Sunday worship services, his pastors, the West Kendall Baptist Church, the multiple Baptist associations, his Iranian friend who introduced him to Christianity, and his uncle; (4) plainly, he is a person of heightened interest to the Iranian government because of his considerable role as a known student protestor, already sanctioned by the Iranian state, and as the son of a known dissident; and (5) his apostasy is undeniably a matter

of public record that can easily be found by Iranian authorities since the BIA makes no effort to conceal its proceedings from international eyes, and all of the opinions of this Court are recorded publicly on the Internet for all the world to see.

All of this goes to the calculus of risk; unfortunately, the BIA's opinion reveals precious little about how they measured these facts or any others in their calculus. Thus we cannot begin to perform any meaningful appellate review from this barren opinion. See Atchison, T. & S.F. Ry. Co. v. Wichita Bd. of Trade, 412 U.S. 800, 807 (1973) ("We must know what a[n agency's] decision means before the duty becomes ours to say whether it is right or wrong.")(citations and quotation marks omitted); Abdulai v. Ashcroft, 239 F.3d 542, 555 (3d Cir. 2001) ("[T]he availability of judicial review (which is specifically provided in the INA) necessarily contemplates something for us to review."). As the majority writes, the BIA must tell us something about its reasoning and the basis for the judgment.

## III.

Finally, it is worth saying what this case is not about. This case does not present a risk of permitting fraudulent asylum claims on the basis of religious persecution. Because refugees must show a threat of particularized harm to establish eligibility for asylum, Mohammed v. U.S. Atty. Gen., 547 F.3d 1340, 1345 (11th Cir.

42

2008), a legal determination that forcing an individual to practice his religion in complete secrecy constitutes religious persecution does not open the floodgates of asylum. On this record, we have to accept that Kazemzadeh is a genuine convert to Christianity who is seeking refuge from a nation that can impose the death penalty for apostasy. Moreover, the Iranian government has already arrested, detained, beaten, monitored, and otherwise punished him for his political activities, which, notably, included protesting the lack of religious freedom in Iran. Simply put, Kazemzadeh is a wanted man in Iran. He has a strong foundation to fear being "singled out for persecution" on the basis of his genuine religious conversion. Al Najjar, 257 F.3d at 1287. And while the sovereign has a powerful interest in preventing aliens from filing fraudulent petitions for asylum, malingering is not at issue in this case. There is no threat of floodgates opening here.

At the end of the day, the BIA may have made a grievous error of law by denying Kazemzadeh's petition for asylum by implicitly accepting that he can avoid the discovery of his apostasy and persecution by renouncing Christianity or practicing in secret. But it cannot be the law that the BIA can force an individual to avoid one form of persecution -- the possible imposition of the death penalty -- only by enduring another form of religious persecution -- abandoning his faith or practicing "underground." The BIA may not consider clandestine practice in its risk calculus.

43

EDENFIELD, District Judge, concurring in part and dissenting in part:

I concur in the denial of the petition as to Kazemzadeh's claims of past persecution and a well-founded fear of future persecution based on his political opinion. I dissent from the majority's vacatur and remand on Kazemzadeh's claim of a well-founded fear of persecution based on his religion. In remanding, the majority has focused on two very subtle and specific considerations that it believes the Board and the Immigration Judge failed to address. First, the majority concludes that the Board failed to consider whether enforcement in Iran of the law against apostasy is rare only "because apostates practice underground and suffer instead that form of persecution to avoid detection and punishment." Second, after summarizing the past encounters between Kazemzadeh and his family and the regime, the majority concludes that, although the Board and the Immigration Judge considered this evidence with regards to Kazemzadeh's past political persecution claim, "this evidence was also relevant to Kazemzadeh's application for asylum based on religious persecution." Thus, the Immigration Court should have considered whether the regime's "heightened interest makes it more likely that Kazemzadeh's religious conversion will be discovered and become a basis for persecution."

I cannot agree with the remand of the case on either of these grounds. First, we typically do not require Immigration Judges or the Board to explicitly address every

44

particular consideration in their opinions. <u>See</u> <u>Tan v. U.S. Att'y Gen.</u>, 446 F.3d 1369, 1374 (11th Cir. 2006) ("Where the Immigration Judge has given reasoned consideration to the petition, and made adequate findings, we will not require that it address specifically each claim the petitioner made or each piece of evidence the petitioner presented.") (quotations, citation, and alterations omitted). In reaching her conclusion here, the Immigration Judge appears to have fully considered all of the relevant facts surrounding Kazemzadeh and his family's past run-ins with the government and also the current conditions for Christians in Iran. Remanding this case because the Immigration Judge and the Board failed to explicitly address certain subtleties is contrary to the deference we traditionally afford Immigration Courts in reaching the ultimate decision.

Additionally, I disagree with the majority's adoption of the Seventh Circuit's decision, <u>Muhur v. Ashcroft</u>, 355 F.3d 958, 960-61 (7th Cir. 2004), that having to practice religion underground to avoid punishment is itself a form of persecution. I do not believe that the adoption of the rule is necessary in this case. The Board concluded, "To the extent that the respondent argues on appeal that there is a pattern or practice of persecution in Iran against people who convert to Christianity, we find that the respondent failed to establish that such a pattern or practice exists …." In reaching this conclusion, the Board appears to have considered the conditions in Iran

45

for all Christian converts (both those practicing openly and those practicing underground) based on the evidence that was before it. First, the country report cited by the majority supports the Board's conclusion, as the small number of arrests of and violence against openly-practicing apostates that it describes were not necessarily based on the individuals' apostasy, but on other grounds. The majority describes the unconfirmed report on a Web site that "unidentified persons killed a man who had converted to Christianity more than 10 years earlier." Additionally, the report states that "several Christians" in the northern part of the country were "reportedly arrested" in May and June 2004, and a Protestant Church was raided in September 2004, but only the minister was imprisoned (for three years), and he was charged not with apostasy, but with "deceiving the armed forces" for failing to disclose his conversion to Christianity. Moreover, the country report states that according to some estimates there were "approximately 100,000 Muslim-born citizens who converted to Christianity" living in Iran at the time. It seems implausible that the near-total absence of documented persecution of apostates in Iran is due simply to the fact that the 100,000 Christian converts are able to keep their Christianity under wraps. The country report itself demonstrates the rarity of persecution against openly practicing apostates in Iran and the virtual absence of apostasy charges and convictions in recent years. It was therefore reasonable for the Board to conclude that no pattern or

46

practice of persecution against Christian converts had been demonstrated in this case.[1]

As a result, the necessity of practicing underground is not of concern in this case, and

the Seventh Circuit's rule is therefore irrelevant and should not be adopted here.

Finally, as to the second ground, I do not see how the regime's past interest in

Kazemzadeh's (and his family's) *political* beliefs would lead to an interest in and

discovery of his current *religious* beliefs, and therefore I do not think the Immigration

Court should be expected or required to specifically address this possibility. The

Immigration Judge and the Board acknowledged Kazemzadeh's previous encounters

with the regime, and they both emphasized the fact that no one in Iran – not even

Kazemzadeh's parents – is aware of his conversion. As the Immigration Judge and

the Board both generally considered this possibility, I do not think we should now

require a more explicit assessment.

Nonetheless, as the majority has ordered that the case be remanded, I believe

there is an additional issue that should be addressed on remand. The Immigration

---

[1]The majority cites Antipova v. U.S. Att'y Gen., in which this Court stated that "the [Immigration and Nationality Act] and the related regulations governing withholding of removal do not require applicants who have faced persecution on account of … religion … to avoid signaling to others that they are indeed … adherents of a certain religion." 392 F.3d at 1264-65. In Antipova, however, it was clear from the country report and other evidence that openly practicing Judaism frequently led to persecution. Id. at 1262-63. In fact, the applicant in that case had suffered past persecution due to her open practice of Judaism. Id. As a result, the need to practice underground was an extremely relevant issue in that case. In the present case, however, the Board reached a conclusion that there was no pattern of persecution against any apostates, and Kazemzadeh presented no persuasive evidence to the contrary. Thus, the issue of underground practice need not be considered.

Court should make a clear credibility determination – be it favorable or adverse – before it addresses the considerations set forth by the majority. In round one of these proceedings (presently under review), no clear credibility determination was rendered, likely because the Board was able to dispose of the case on other grounds. On remand, however, credibility could be a dispositive determination, and it therefore should be explicitly addressed.

Immigration Judges "must make clean determinations of credibility." Yang v. U.S. Att'y Gen., 418 F.3d 1198, 1201 (11th Cir. 2005) (quotation and citation omitted). In this case, although the Immigration Judge never directly addressed the issue of credibility, she commented throughout her order on the numerous questionable aspects of Kazemzadeh's religious conversion. First, she stated that his "inability to explain what communion is … seemed inconsistent with any significant involvement with the religion" since communion is a "central aspect of Christianity." She also noted that he attended weekly Bible classes less than once per month, and opined that he should be making "the effort to attend as many of those classes as possible in order to learn a religion for which he alleges that he's willing to risk his life." After noting that Kazemzadeh decided to become a Christian approximately two months after he began attending church, the Immigration Judge stated that "it was[] [not] clear how much he knew in those two months that [led] him to make a

life-time commitment that would put him at odds with his family and with his country." She also pointed out factual inconsistencies between Kazemzadeh's testimony and that of his pastor, and she expressed suspicion about the authenticity of documents he provided as evidence of his conviction and his expulsion from the university he attended in Iran. Finally, in her conclusion, the Immigration Judge noted that the swiftness of Kazemzadeh's acceptance of Christianity "does not evidence a lifetime commitment."[2]

In its own decision, the Board stated in a footnote that, "although the Immigration Judge expressed problems with some of [Kazemzadeh's] testimony, she did not make an adverse credibility finding." Despite the Board's interpretation, the majority takes quite a leap and concludes that "neither the Board nor the Immigration Judge discredited Kazemzadeh's testimony or other evidence about his conversion" and that "the Board found that Kazemzadeh's conversion to Christianity is genuine," simply because there was no express determination that he was not credible. The majority cites De Santamaria v. U.S. Att'y Gen., 525 F.3d 999 (11th Cir. 2008), and Mejia v. U.S. Att'y Gen., 498 F.3d 1253 (11th Cir. 2007), for the proposition that the lack of an adverse credibility determination by the Immigration Judge forecloses any

_____

[2] The timing of Kazemzadeh's swift conversion is also noteworthy. He testified that he first began visiting Christian church services in September 2005, which was approximately one month prior to the expiration of his visa, and he converted shortly thereafter, in early November 2005.

suggestion that Kazemzadeh was anything "less than credible." Neither of those cases, however, directly held that such a presumption is the rule in this circuit. Instead, both De Santamaria and Mejia cited to Yang, 418 F.3d at 1201, as the alleged authority for such a credibility presumption. First, De Santamaria stated in a footnote that, "Where an [Immigration Judge] fails to explicitly find an applicant's testimony incredible and cogently explain his or her reasons for doing so, we accept the applicant's testimony as credible." 525 F.3d at 1011 n.10. Mejia likewise held that the applicant's entire testimony should be accepted as credible since the Immigration Judge did not make a specific adverse credibility finding. 498 F.3d at 1257. In reaching those determinations, the Court in both De Santamaria and Mejia relied heavily (if not exclusively) upon a particular passage from Yang: "Though the [Immigration Judge] made a reference to Yang's claims as 'a ridiculous fabrication,' and stated that her testimony was 'extremely inconsistent and [made] absolutely no sense whatsoever,' we are not persuaded that this was an explicit finding that Yang's testimony was not credible." De Santamaria, 525 F.3d at 1011 n.10 (citing Yang, 418 F.3d at 1201); Mejia, 498 F.3d at 1257 (same). In my view, however, Yang does not mandate the strict presumption applied by the Court in De Santamaria and Mejia. I believe that, in Yang's progeny (i.e., De Santamaria, Mejia, and the case at hand), the

50

Court has been overstating Yang's case-specific credibility remark as standing for a mandatory general presumption that Yang in no way announced.

In Yang, this Court faced similar facts to the current case: despite the fact that the Immigration Judge referred to the alien's claims as a "ridiculous fabrication" and stated that her testimony was "extremely inconsistent and made absolutely no sense whatsoever," this Court found that the Immigration Judge had not explicitly found the alien's testimony not credible. Id. at 1201. The Court, however, did not hold that the testimony was therefore deemed credible, but instead avoided the issue of credibility, explaining, "[T]he thrust of the [Immigration Judge's] analysis focuses on the insufficiency of Yang's evidence, rather than on any credibility issues. Thus, for purposes of our review, we will assume that any credibility determinations by the [Immigration Judge] were *not* dispositive of the appeal." Id. (emphasis in original).

Thus, I think the more accurate interpretation of the Immigration Judge's findings is that, despite raising numerous concerns pertaining to Kazemzadeh's credibility, she declined to make a credibility determination because she chose to dispose of the case on the basis of insufficient evidence, instead of on credibility grounds. The Board's decision therefore also focused on the conclusion that, even if Kazemzadeh is a Christian, his claim would not succeed, as he had not shown that anyone in Iran is aware or would become aware of his conversion and he also had not

shown that there is a pattern or practice of persecution in Iran against converts to Christianity. Thus, rather than relying on cases that perpetuate an inaccurate interpretation of a previous case, the majority should take this opportunity to course-correct its interpretation and application of Yang. The Court should therefore assume simply that "any credibility determinations by the [Immigration Judge] were *not* dispositive of the appeal," 467 F.3d at 1296, and not that "the Board found that Kazemzadeh's conversion to Christianity is genuine" or that "neither the Board nor the Immigration Judge discredited Kazemzadeh's testimony or other evidence about his conversion." As a result, the Board should make a clear credibility determination on remand, especially since, in light of the majority's required considerations, the credibility determination could have a dispositive effect.