PRYOR, Circuit Judge:
The key question presented by this petition is whether an applicant for asylum whose testimony about past persecution is incredible and who, by his own admission, lived peaceably for three years after his military service before his arrival in the United States conclusively proved a well-founded fear of future persecution by presenting evidence that some other persons have been forcibly conscripted and tortured in his native country. Hamed Mohammed, a native and citizen of Eritrea, petitions for review of the denial of his application for asylum and withholding of removal by the Board of Immigration Appeals. The Immigration Judge found that Mohammed’s testimony about past persecution in the Eritrean military was incredible because it contained inconsistencies and implausibilities and was not corroborated by reliable evidence. The Immigration Judge also found that Mohammed did not have a well-founded fear of persecution because it is undisputed that Mohammed was not persecuted during the three years that he lived and worked in Eritrea after he finished his military service. The Board affirmed. Because substantial evidence supports the findings of the Immigration Judge and the Board, we deny Mohammed’s petition.
I. BACKGROUND
In April 2005, Mohammed arrived in the United States as a stowaway aboard a cargo ship. An asylum officer conducted a credible-fear interview, and Mohammed alleged past persecution and fear of future persecution by the Eritrean military. The asylum officer referred Mohammed to an Immigration Judge to determine his eligibility for asylum. In July 2005, Mohammed filed his application for asylum, 8 U.S.C. § 1158(a)(1), withholding of removal, id. § 1231(b)(3), and relief under the Convention Against Torture, 8 C.F.R. § 208.16(c)(2).
Mohammed alleged that he was conscripted into the Eritrean military in 1999, when he was in the seventh grade. He alleged that he was tortured on three occasions because he was suspected of planning to desert. He alleged that soldiers tied his hands behind his back, hung him from a tree by his hands, and beat him in front of other men. On another occasion, soldiers allegedly tied his feet and arms together and placed him in “the 8” position, chest-down on the ground, for an hour a day during the hottest part of the day for four or five days. On a third occasion, soldiers allegedly beat him with a stick on his leg. Mohammed also alleged that the military suppressed his religion by refusing to allow him “to do his prayers.” Mohammed stated that he escaped from the military “at the end of 2001” and hid in Massawa. Mohammed stated that he had “no doubt at all” that if he went back to Eritrea, he would lose his life. Mohammed included with his application news articles and publications regarding Eritrea and human rights abuses there.
In October 2005, Mohammed filed a memorandum in support of his application. Mohammed’s filing included the country profile for Eritrea published by the State Department, more news articles, and re *1342 ports from private organizations regarding human rights abuses in Eritrea. The memorandum also contained new allegations of abuse. Mohammed described an incident in which the military tied his body in “the 8” position and beat him for an hour a day for two weeks after he disobeyed an order to arrest the elderly mother of a military deserter. Mohammed also alleged that while he was in the United States, he learned that the military had visited his parents’ house to search for him. He alleged that the military detained and beat his father.
In April and May 2006, Mohammed filed three submissions of additional evidence to support his application. The first submission included letters to Mohammed from his brother and father, a photograph of Mohammed, and copies of personal identification cards issued to him by his school, the Massawa Port, a national students’ organization, and the Eritrean government. The letter allegedly written by his brother described the detention of Mohammed’s father and referred to Mohammed as the writer’s son. The identification cards bore his true name and photograph but stated different dates of birth. The second submission included background information on Eritrea from the State Department and an affidavit and book chapter from Professor Dan Connell. The third submission included a medical report dated May 3, 2006, by Dr. Sudha Reddy of Atlanta, Georgia, that described scars on Mohammed’s back and injuries to his rotator cuffs. In the patient history section, the medical report included Mohammed’s assertion about the cause of his injuries.
On August 16, 2006, Mohammed and his counsel appeared for a hearing before the Immigration Judge. Mohammed testified that he was taken from his school in 1999 when he was in the seventh grade and forced to serve in the Eritrean military. He testified that his responsibilities included harvesting crops and standing watch for enemies. He testified that soldiers beat him while his body was tied in “the 8” position for an hour a day for two weeks after he disobeyed an order to arrest the elderly mother of a military deserter. He testified that he was physically abused by members of the military on three occasions because he was suspected of planning to desert and because he worked slowly.
Mohammed testified that “toward the end of 2001” he escaped from the military. After his supervisor had left the base and while other officers slept, Mohammed placed his weapon under his mattress, walked off the base, and traveled by bus to the home of his family in Massawa. He stated that he spent “two to three months” with his family before he obtained a government-issued identification card to find a job. Mohammed stated that the military did not look for him at the home of his family during this time.
Mohammed testified that he secured a job as a crane operator at the port in Massawa, which was owned by the government. Mohammed testified that he moved into a house that he shared with other crane operators, reenrolled in the school from which he had been conscripted by the military, occasionally went into town, and visited his relatives at least once every two weeks. Mohammed testified that, during this period, the military conducted at the port monthly “roundups” of those who deserted or evaded military service and he was able to hide from the authorities in the crane or in ships or containers at the port. Mohammed testified that he worked at the port for approximately three years before leaving for the United States. Mohammed also testified that, after he left Eritrea, his father was beaten by the Eritrean military and his brothers were conscripted.
*1343 Mohammed offered explanations for the discrepancies in his prehearing submissions. He testified that the four identification cards stated different birth dates because he gave false birth dates to the authorities to prevent the military from locating him. He testified that the letter allegedly written by his brother, which described the detention of their father and referred to Mohammed as the writer’s son, explained what happened to their father from their father’s perspective. Mohammed also submitted information about human rights abuses in Eritrea in reports published by the government „of the United Kingdom, and an additional report about abuses in Eritrea published by the State Department.
On cross-examination, Mohammed testified that he waited approximately one month after arriving at his parents’ home before he obtained his identification card and began to look for a job. In response to questions about this delay, Mohammed testified that he waited to apply for the card to spend time with his family and to determine whether the-military would attempt to follow him. He stated that when he “found out that they were not going to [he] decided to go get the ID card.” In response to questions about his alleged inability to practice his Muslim faith in the military, Mohammed testified that he was never punished on the basis of his religion because he “was not really at the age where [he] worshipped.” Finally, when asked to give the “urgent reason” he left Eritrea, Mohammed testified that “it’s a country where human rights is not respected” and that he “had to flee to save [his] life.”
The Immigration Judge found that Mohammed’s testimony was not credible because there were inconsistencies between Mohammed’s oral and written statements, his testimony was implausible, and the documentary evidence did not corroborate his testimony. The Immigration Judge explained that Mohammed failed to mention in either his credible-fear interview or his asylum application the incident when he allegedly was placed in “the 8” position and beaten after refusing to detain the elderly woman. The Immigration Judge found that the notes from the credible-fear interview did not mention any incident in which Mohammed alleged that he was punished for failing to obey an order with which he disagreed. The Immigration Judge also found inconsistencies regarding Mohammed’s ability to practice his religion in the military. In his asylum application, Mohammed stated that he was “not allowed to do [his] prayers,” but at his hearing, Mohammed testified that he did not practice his religion while he was in the military. Mohammed testified that he was not at the age where he was worshiping and that he was never punished on the basis of his religion. The Immigration Judge found implausible Mohammed’s contention that he was under constant surveillance as a possible deserter because Mohammed testified that he escaped by walking away from his barracks and boarding a bus on the street. The Immigration Judge also found implausible Mohammed’s allegation that, after he escaped the military, he immediately returned to his hometown, where he had been conscripted. The Immigration Judge found implausible Mohammed’s allegation that the military was actively searching for him while he was in “hiding” in Massawa because Mohammed openly worked for the government at the port and applied in person for a government identification card. The Immigration Judge found that Mohammed’s explanation for the disparate birth years on his identification cards “defies credulity.” The Immigration Judge found that Mohammed’s testimony suggested that, although the military may have engaged in random roundups, it had *1344 not singled out and actively searched for Mohammed.
In addition to making an adverse credibility determination, the Immigration Judge found that Mohammed had not provided other credible evidence that he had been persecuted on account of his religion or political opinion. The letter allegedly written by Mohammed’s brother referred to Mohammed as the author’s son, and the letter allegedly written by Mohammed’s father stated that the father had been jailed and released, not beaten, after Mohammed left Eritrea. The medical report Mohammed submitted did not provide any medical evidence of how Mohammed’s ro-tator cuffs were injured. The Immigration Judge also found that the identification cards Mohammed submitted were unreliable because Mohammed admitted that the cards contained false information.
Because the Immigration Judge found that Mohammed had not proved that he was persecuted in the past, the Immigration Judge did not presume that Mohammed had a well-founded fear of persecution in the future. See 8 C.F.R. § 1208.13(b)(1). The Immigration Judge found that Mohammed had not proved a well-founded fear of future'persecution because Mohammed failed to establish a reasonable probability that he would have to serve in the military if he returned to Eritrea.
The Immigration Judge denied Mohammed’s application for asylum and withholding of removal. Mohammed appealed to the Board of Immigration Appeals, which dismissed the appeal. The Board found that the inconsistencies, discrepancies, and implausibilities in Mohammed’s testimony and evidence supported the adverse credibility finding and denial of asylum and withholding of removal by the Immigration Judge.
II. STANDARD OF REVIEW
We review the decision of the Board, Reyes-Sanchez v. U.S. Att’y Gen., 369 F.3d 1239, 1242 (11th Cir.2004), and we review the decision of the Immigration Judge to the extent that the Board expressly adopted the opinion of the Immigration Judge. Savoury v. U.S. Att’y Gen., 449 F.3d 1807, 1312 (11th Cir.2006); Al Najjar v. Ashcroft, 257 F.3d 1262, 1284 (11th Cir.2001). Because the Board agreed with the adverse credibility determination and the findings that Mohammed did not suffer past persecution, we review the decisions of both the Immigration Judge and the Board regarding those findings. See Al Najjar, 257 F.3d at 1284. Because the Board did not comment on the decision of the Immigration Judge regarding Mohammed’s alleged fear of future persecution, we review the findings of the Immigration Judge about that issue.
We review factual findings, including credibility determinations, under the substantial evidence test. Forgue v. U.S. Att’y Gen., 401 F.3d 1282, 1286 (11th Cir. 2005). We “affirm [the decision of the Board] if it is supported by reasonable, substantial, and probative evidence on the record considered as a whole.” Al Najjar, 257 F.3d at 1284 (internal quotation marks omitted). The REAL ID Act provides that a trier of fact may base an adverse credibility determination on the inherent implausibility of an applicant’s testimony, the inconsistency of his testimony with other evidence, or the internal inconsistency of his testimony, regardless of whether any implausibilities or inconsistencies go to the heart of the applicant’s allegations of past persecution or fear of future persecution. Pub.L. No. 109-13, 119 Stat. 231, 303 (codified at 8 U.S.C. § 1168(b)(1)(B)(iii)).
Our standard is highly deferential. Because the Immigration Judge made an ad *1345 verse credibility determination, “the burden is on the applicant alien to show that the ... credibility decision [of the Immigration Judge] was not supported by specific, cogent reasons or was not based on substantial evidence.” Forgue, 401 F.3d at 1287 (internal quotation marks omitted). “[W]e review the record evidence in the light most favorable to the agency’s decision and draw all reasonable inferences in favor of that decision.” Adefemi v. Ashcroft, 386 F.3d 1022, 1027 (11th Cir.2004). We may reverse a finding of fact “only when the record compels a reversal; the mere fact that the record may support a contrary conclusion is not enough to justify a reversal of the administrative findings.” Id.; see also 8 U.S.C. § 1252(b)(4)(B) (“[T]he administrative findings of fact are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary!.]”). We “may not substitute [our] judgment for that of the [Board] with respect to credibility findings.” D-Muhumed v. U.S. Att’y Gen., 388 F.3d 814, 818 (11th Cir.2004).
III. DISCUSSION
To establish asylum eligibility, an applicant must prove that he is a “refugee” under the Immigration and Nationality Act. See 8 U.S.C. § 1158(b)(1); see also Al Najjar, 257 F.3d at 1284. A “refugee” must either have suffered persecution or have a well-founded fear of future persecution “on account of race, religion, nationality, membership in a particular social group, or political opinion.” 8 U.S.C. § 1101(a)(42)(A). To establish that he has suffered past persecution, an applicant must “prove (1) that [ ]he was persecuted, and (2) that the persecution was on account of a protected ground.” Silva v. U.S. Att’y Gen., 448 F.3d 1229, 1236 (11th Cir.2006). To establish a well-founded fear of future persecution, an applicant must “present detailed, specific facts showing a good reason to fear that he ... will be singled out for persecution on account of such opinion.” Al Najjar, 257 F.3d at 1287 (quoting Faddoul v. INS, 37 F.3d 185, 188 (5th Cir.1994)) (internal quotation marks omitted). An applicant may be able to meet his statutory burden by providing uncorroborated but credible testimony, and in the absence of corroborating evidence, an adverse credibility determination may be sufficient to support the denial of an application. See 8 C.F.R. § 208.13; see also Forgue, 401 F.3d at 1287; D-Muhumed, 388 F.3d at 819. An applicant who cannot meet the standard for asylum cannot meet the standard for withholding of removal. D-Muhumed, 388 F.3d at 819; see also Al Najjar, 257 F.3d at 1292-93.
We address Mohammed’s petition in two parts. First, we discuss whether substantial evidence supports the finding that Mohammed failed to prove past persecution. Second, we discuss whether substantial evidence supports the finding that Mohammed failed to prove a well-founded fear of future persecution.

A. Substantial Evidence Supports the Finding That Mohammed Failed To Prove Past Persecution.

The record does not compel a finding that Mohammed suffered past persecution. Extensive evidence supports the adverse credibility determination of the Immigration Judge and the Board, and substantial evidence supports the finding that Mohammed’s other evidence was unreliable.
Numerous inconsistencies and implausibilities in Mohammed’s testimony regarding past persecution taint both his account of his service in the military and his description of his experiences in Eritrea after he left the military. Mohammed testified that he was punished after he refused to arrest the elderly mother of a deserter, but he did not mention this incident or any *1346 other incident in which he was punished for disobeying an order in either his credible-fear interview or asylum application. Mohammed alleged that he was under constant surveillance while in the military, but he also alleged that he left the military by walking away from his barracks and using public transportation to travel to the home of his family. Mohammed stated in his application that the military did not allow him to practice his religion, but he testified at his hearing that he was never punished on the basis of his religion. Mohammed testified that, after he deserted the military in 2001, soldiers constantly searched for him and he was forced to go into hiding, but he also testified that he lived with his parents without incident for about three months after his desertion; obtained employment in a government-owned port; lived at the port without incident for three years; obtained in person a government-issued identification card; returned to the same school from which he had been conscripted; and visited his family at least every two weeks. We conclude, and the dissent agrees, that substantial evidence supports the finding of the Immigration Judge and the Board that Mohammed’s testimony was incredible.
Mohammed argues that his letters, medical report, and identification cards substantiate his claims of past persecution, but the record supports the finding of the Immigration Judge that this evidence is unreliable. The letter allegedly written by Mohammed’s brother about the abuse of their father referred to Mohammed as the writer’s son. Although Mohammed testified that his father was detained and beaten by the military after Mohammed left Eritrea, the letter allegedly written by his father does not mention any beating. Each of Mohammed’s four identification cards bore a different date of birth, and Mohammed failed to offer a plausible explanation for the disparity. The medical report confirmed Mohammed’s injuries to his rotator cuffs and, in the patient history section, included Mohammed’s assertion about the cause of his injuries.

B. Substantial Evidence Supports the Finding That Mohammed Does Not Have a Well-Founded Fear of Persecution.

The record also does not compel a finding that Mohammed presented “specific, detailed facts showing a good reason to fear that he ... will be singled out for persecution .... ” Al Najjar, 257 F.3d at 1287 (quoting Faddoul, 37 F.3d at 188) (internal quotation marks omitted). Mohammed submitted evidence that abuses of human rights occur in Eritrea, but that evidence is not specific to Mohammed. None of that evidence compels a finding that Mohammed has a well-founded fear that he will be singled out for persecution if he returns to Eritrea.
The dissent contends that Mohammed established a well-founded fear of persecution based on the reasonable possibility of forced service in the Eritrean military, but we disagree. Mohammed had to prove either that he would be disproportionately punished for refusing to serve in the Eritrean military or that he would be forced to join an internationally condemned military. Mekhoukh v. Ashcroft, 358 F.3d 118, 126 (1st Cir.2004). The likelihood of punishment for refusal to serve is just as essential to the latter burden of proof as it is to the former: “An alien’s claim to asylum based on his objection to serving in an internationally condemned military requires proof that there is a reasonable possibility that the alien will have to serve or be punished for refusing to serve.” Id. at 127 (citing Mojsilovic v. INS, 156 F.3d 743, 747 (7th Cir.1998)).
The dissent contends that Mohammed met both burdens of proof, but because the record does not compel a conclusion that *1347 Mohammed will have to serve in the Eritrean military if he returns to Eritrea, much less that he will be punished for failing to serve, Mohammed has met neither burden of proof. Substantial evidence supports the finding of the Immigration Judge that Mohammed failed to prove that he would be forced to join the military if he returned to Eritrea. Mohammed’s evidence that the military has searched for him at the home of his family since his arrival in the United States is unreliable, and Mohammed’s testimony about his experiences during the three years before he left Eritrea does not compel a finding that he will be conscripted if he returns. Before he left Eritrea, Mohammed, without incident, obtained a government-issued identification card, worked in a government-owned facility in his hometown, reen-rolled in the school from which he had been conscripted, and regularly visited his family at their home. Viewed in the light most favorable to the decision of the Immigration Judge, the record supports a finding that Mohammed lived an open and peaceful life after his service in the military. The record does not compel a finding that Mohammed would be unable to return to a similar life.
The dissent contends that the Immigration Judge “made his determination solely on Mohammed’s testimony, effectually punishing Mohammed for stories that the [Immigration Judge] deemed implausible and that, in the ... mind [of the Immigration Judge], did not add up,” but this accusation is unpersuasive. First, the accusation is incorrect. The Immigration Judge considered both Mohammed’s testimony and his documentary evidence, and the Immigration Judge denied relief on the basis of both the adverse credibility determination and his finding that Mohammed had not offered any reliable corroborative evidence: “[T]here is no reliable evidence on the record to conclude that [Mohammed] deserted the army or refused conscription on account of his opinions or beliefs.” Second, the accusation that the Immigration Judge denied relief on the basis of testimonial implausibilities identifies no defect in the decision of the Immigration Judge. The Immigration Judge was entitled to deny relief on the basis of internal inconsistencies and implausibilities in Mohammed’s testimony. Although the Immigration Judge was obligated to consider Mohammed’s documentary evidence, the Immigration Judge was under no obligation to credit it or assign it decisive weight. The regulations permit the Immigration Judge to deny relief upon finding that Mohammed failed to corroborate incredible testimony. “Th[e] language [in 8 C.F.R. § 208.13] plainly indicates that if the trier of fact either does not believe the applicant or does not know what to believe, the applicant’s failure to corroborate his testimony can be fatal to his asylum application.” Sidhu v. INS, 220 F.3d 1085, 1090 (9th Cir.2000).
The dissent also contends that the Immigration Judge engaged in “personal speculation,” “idle musings,” “guesswork” and “supposition[s]” about the likelihood that Mohammed would be conscripted upon return to Eritrea, but these allegations misconstrue the findings of the Immigration Judge. The Immigration Judge found that Mohammed may have been released from the military and that he is unlikely to be conscripted upon return to Eritrea directly on the basis of Mohammed’s own testimony. In the light of Mohammed’s various admissions that, after he left the military, he lived with his family, applied for and received and worked a government job, reenrolled in school, later lived in government housing, and regularly visited his family, all without incident, the finding of the Immigration Judge that Mohammed would not likely face continued military service upon return *1348 to Eritrea cannot be described fairly as a “theory.”
The dissent contends that it is “fundamentally unfair” for us to rely on Mohammed’s various admissions to affirm the finding of the Immigration Judge because we credit testimony that we have found incredible, but this argument misses the mark. The law permits a trier of fact to base an adverse credibility determination on internal inconsistencies in an applicant’s testimony, 8 U.S.C. § 1158(b)(l)(B)(iii), and the point of an internal inconsistency is that the trier may believe one part of an applicant’s story and not believe others. The Immigration Judge and the Board are entitled to credit some parts of Mohammed’s testimony and to discredit others.
The dissent also contends that Mohammed’s evidence of abuses of others in Eritrea compels a finding that he will be conscripted or punished upon his return, but the Immigration Judge and the Board assigned greater weight to the substantial testimonial and documentary evidence that was specific to Mohammed. Regardless of whatever persecution others have suffered, we know that Mohammed was not recalled into service or persecuted in the three years he remained in Eritrea after he left the military. Mohammed admitted it, and the Immigration Judge was entitled to rely on that admission. The Immigration Judge was also entitled to find that the evidence that the military has searched for Mohammed since he left Eritrea is unreliable.
The dissent places decisive weight on objective evidence in the record, but we cannot undertake a de novo review. “Whether we, like the dissent, would have made different findings, if faced with [Mohammed’s] application for asylum and live testimony, is irrelevant.” Silva, 448 F.3d at 1243. Our standard of review is based on the understanding that “the Immigration Judge is in a superior position to make findings of fact.” Id. at 1242.
The dissent also objects that requiring Mohammed to prove that he will be singled out for persecution if he returns to Eritrea “neglects to appreciate” that some groups may be systematically persecuted on the basis of their religion or political opinions and “fails to engage in [the] weighing that the complex relationship between group and individual targeting requires[,]” but again, the law does not permit the approach the dissent suggests. The law provides that Mohammed bore the burden of proving his fear of future persecution. Al Najjar, 257 F.3d at 1287. Our review is limited to deciding whether the evidence, viewed in the light most favorable to the Immigration Judge, compels a reversal. Adefemi, 386 F.3d at 1027. Evidence of group membership, standing alone, cannot compel a finding of a well-founded fear of persecution when the record contains ample evidence to support the contrary finding by the Immigration Judge.
IV. CONCLUSION
Mohammed’s petition for review is denied.
PETITION DENIED.