[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 09-10665
Non-Argument Calendar
_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
SEPTEMBER 23, 2009
THOMAS K. KAHN
CLERK

Agency No. A088-052-440

VICTOR HUGO JIMENEZ-MATEUS,

Petitioner,

versus

U.S. ATTORNEY GENERAL,

Respondent.

_____

Petition for Review of a Decision of the
Board of Immigration Appeals

_____

(September 23, 2009)

Before MARCUS, PRYOR and ANDERSON, Circuit Judges.

PER CURIAM:

Victor Hugo Jimenez-Mateus, a native and citizen of Colombia, petitions for

review of the denial of his application for asylum and withholding of removal under the Immigration and Nationality Act and relief under the United Nations Convention Against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment. 8 U.S.C. §§ 1158, 1231; 8 C.F.R. § 208.16(c). The immigration judge and the Board of Immigration Appeals found that Jimenez-Mateus failed to prove that he suffered past persecution or has a well-founded fear of future persecution. We deny Jimenez-Mateus's petition.

## I. BACKGROUND

Our discussion of the background of this petition is divided into two parts. We first discuss Jimenez-Mateus's entrance to the United States and his application for asylum, withholding of removal, and relief under the Convention. We next discuss his removal hearing, the decision of the immigration judge, and ruling of the Board.

### A. Jimenez-Mateus's Entrance to the United States and Application

In 2005, Jimenez-Mateus entered the United States as a tourist. After he was served a notice to appear, Jimenez-Mateus filed an application for asylum, withholding of removal, and relief under the Convention. Jimenez-Mateus alleged that he was persecuted because of his political opinion.

In his application, Jimenez-Mateus argued that he was persecuted by the Revolutionary Armed Forces of Colombia because he and his stepbrother, Carlos

2

Mateus, campaigned for Alvaro Uribe. Jimenez-Mateus alleged that he became involved in politics because of his father, Jose Jimenez, who served as a councilman in Oicata even though the family lived in Bogota. Jose Jimenez was a member of the Colombian Conservative Party, but Jimenez-Mateus never joined a political party. In September 2001, Jimenez-Mateus and his stepbrother, Carlos Mateus, joined the campaign to elect Uribe as president of Colombia.

In February 2002, Jose Jimenez received a telephone call from a man who stated "they were waiting for [Jose] at his house in the town of Villeta[,]" and Jose canceled his vacation. Later that month, the watchman at a vacation home for Jimenez-Mateus's mother was murdered. The watchman had been shot in the back of the head, his tongue cut off, and his fingernails removed. Two days later, Carlos Mateus received a telephone call threatening to harm him and Jimenez-Mateus. That same evening, Jimenez-Mateus received a telephone call and a man said, "Listen you bastard, we already talked to your brother, now it is your turn . . . . Go ahead and keep speaking in favor of the paramilitary Uribe and we are going to take your tongue out, as we did to the watchman. You will be next if you don't wake up." The next day, Jimenez-Mateus moved into his parent's home. Jimenez-Mateus and Carlos Mateus believed the caller was a member of the Revolutionary Armed Forces because their father had been threatened by the organization and the caller referred to Uribe as a paramilitary. Jimenez-Mateus and his stepbrother

3

reported the telephone calls to the "State Attorney Office," but the brothers were unable to file a report because they could not identify the caller.

In April 2002, Carlos Mateus received several threatening telephone calls and moved to Medellin with his wife and children. Jimenez-Mateus also received calls on his cellular telephone from "unknown numbers in which [he] was told that 'they would kill me the way that grassy watchman was killed in the farm' if [he] continued to work for the 'paramilitary Alvaro Uribe[.]'" Jimenez-Mateus kept campaigning for Uribe, but changed the number for his cellular telephone. In May 2002, Uribe was elected president of Colombia and, later that year, Jose Jimenez retired from politics.

In December 2002, Jimenez-Mateus married and moved to the municipality of Colina Campestre. The following year, Jimenez-Mateus and his stepbrother continued their work with the Conservative Party to pass legislation promoted by Uribe. In November 2003, Jimenez-Mateus traveled to the United States to take aptitude tests to obtain a license as a commercial aviator and, later that month, he returned to Colombia.

In 2004, Jimenez-Mateus began to speak at meetings to promote Uribe's legislation. After one meeting in January 2005, three men riding in a jeep approached Jimenez-Mateus and asked about the location of the meeting. Jimenez-Mateus walked toward the jeep and noticed that the men were carrying guns and

4

wearing uniforms of the Revolutionary Armed Forces. The men did not recognize Jimenez-Mateus and told him they came "to protect the people of this village from the . . . corrupt and oligarch politicians . . . ." When the jeep drove away, Jimenez-Mateus got into his car and drove away. As Jimenez-Mateus entered the highway to Bogota, he noticed the jeep behind him. The men followed Jimenez-Mateus until he reached a toll plaza, where he reported the incident to three officers of the National Police of Colombia. Jimenez-Mateus waited at the toll plaza for two hours and took an alternate route to Bogota. Later, Jimenez-Mateus sought protection from a local representative, who responded he would try to have police present at future meetings. Jimenez-Mateus attended later meetings in different vehicles or with members of the Conservative Party.

In March 2005, Jimenez-Mateus received a telephone call from his mother-in-law who said that Jimenez-Mateus's wife "had a nervous breakdown as a consequence of a telephone call" in which a man said that Jimenez-Mateus's "life and [his] destiny were no longer in [his] hands" because he continued to "support the current corrupt political system of Colombia and the paramilitary of Alvaro Uribe[.]" When Jimenez-Mateus reached the hospital, the doctors said that his wife had suffered an "emotional shock" that sent her into premature labor. Jimenez-Mateus disconnected his home telephone and changed the numbers of his cellular telephones.

5

According to Jimenez-Mateus, the threats continued. In August 2005, one month after "alleged[]" members of the Revolutionary Armed Forces attempted to kill his stepbrother, Jimenez-Mateus received a call on his cellular telephone. The caller told Jimenez-Mateus that he had been "order[ed] several times to stop supporting . . . Alvaro Uribe" and he would receive "one last chance to repent" and to "follow [his] father who retired on time and obeyed [their] orders" or otherwise his son would "be left as an orphan[.]" Jimenez-Mateus sent his wife to live with her mother, but he remained in Bogota. Jimenez-Mateus made arrangements for his wife and son to live with "acquaintances" in the United States, but she refused to leave Colombia because her father was in poor health.

In October 2005, Jimenez-Mateus returned to his apartment to check his mail and discovered two men inside. The men chased Jimenez-Mateus to his car and, after he sped away, he heard gun shots. Jimenez-Mateus hid at his sister's house and fled to the United States even though he was unable to convince his wife to leave the country.

In November 2005, Jimenez-Mateus returned to Colombia to visit his mother, who had suffered a heart attack. Jimenez-Mateus reunited with Carlos Mateus, who had fled Cali after he was discovered by the Revolutionary Armed Forces, and the two traveled to the United States. A family friend later visited Jimenez-Mateus's apartment and found a letter from the Revolutionary Armed

6

Forces dated November 8, 2005 that declared Jimenez-Mateus a "'military objective'" because he had "support[ed] the paramilitary of Alvaro Uribe" and failed to "obey[] their orders." In October 2006, Jimenez-Mateus's wife and son traveled to the United States.

Jimenez-Mateus submitted several documents to support his application. He included a copy of an application for asylum filed by his stepbrother, a copy of a letter from the Revolutionary Armed Forces dated November 9, 2005, that declared Carlos Mateus a "military objective," and a letter granting Carlos asylum. Jimenez-Mateus also submitted affidavits from two former mayors of Oicata that stated Jimenez-Mateus had participated in the campaigns of Jose Jimenez and Uribe.

*B. Jimenez-Mateus's Removal Hearing and Rulings of the Immigration Judge and Board*

At the removal hearing, Jimenez-Mateus repeated the allegations of persecution he mentioned in his application, and he elaborated on one incident. Jimenez-Martinez testified that, as he fled from his apartment, the men he discovered in the apartment shot at and damaged the back window and left brake light of his jeep. Jimenez-Martinez acknowledged that he did not have any evidence of the damage to his jeep; of his encounter with members of the Revolutionary Armed Forces after the town hall meeting; that the watchman at his

7

mother's vacation home had been murdered; that he had been followed by members of the Revolutionary Armed Forces in a jeep; or that his wife had received a telephone call threatening Jimenez-Mateus. Jimenez-Mateus also acknowledged that he was not persecuted when, during the time he campaigned for Uribe, he worked at the family store selling Honda parts, and he was not discovered or threatened when he returned from the United States to visit his mother at a hospital in Bogota.

Jimenez-Mateus acknowledged that he had traveled to the United States in December 2002, November 2003, October 2005, and November 2005. He testified that his wife visited the United States on February 5, 2005, and again on January 25, 2006, but he corrected himself and stated that she visited in January and February 2006 before she joined him permanently in October 2006. Jimenez-Mateus also testified that his wife was "outside the Court with the baby."

The immigration judge denied Jimenez-Mateus's application. The immigration judge ruled that Jimenez-Mateus's "testimony was not sufficiently detailed, consistent or believable to provide a plausible and coherent account of the basis of his fears and thus [could not] suffice to establish his eligibility for asylum, withholding of removal and/or Torture Convention relief." Although the immigration judge found that Jimenez-Mateus "for the most part testif[ied] consistently with" his application, the judge "found that many aspects of [Jimenez-

8

Mateus's] claims [were] implausible" and uncorroborated, even though "there [were] many documents which could and should have been presented . . . ." The immigration judge "found it very odd" that Jimenez-Mateus's family lived in Bogota, but participated in politics in a town two hours away; Jimenez-Mateus alleged that he was prosecuted only for his work with Uribe, even though his father also was persecuted; and Jimenez-Mateus and his stepbrother received corresponding threats when the two men did not campaign, live, or "have much contact with each other." The immigration judge also found it "to be a significant coincidence" that the letters written by the Revolutionary Armed Forces and sent to Jimenez-Mateus and his stepbrother were "written one day apart" and were "identical in terms of content and format" even though they were "from allegedly different commandants of different FARC units in different parts of Colombia."

The immigration judge ruled that the incidents involving the Revolutionary Armed Forces did not amount to persecution and Jimenez-Mateus failed to provide evidence to corroborate those incidents. In the absence of some corroboration, the immigration judge found it "very implausible" that Jimenez-Mateus and Carlos Mateus received threats that they would die like the watchman when the three men were not "anyway associated with" each other; Jimenez-Mateus had been confronted by members of the Revolutionary Armed Forces and escaped those encounters; and Jimenez-Mateus's wife went into premature labor because of a

9

telephone call. The immigration judge "found it odd" that Jimenez-Mateus "gave a much more graphic statement with respect to his wife's reaction"; he failed to provide any medical documents about the delivery or his wife's condition; and he did not call his wife to testify when she accompanied him to the removal hearing.

The immigration judge found that the actions of Jimenez-Mateus and his wife were not "consistent with the actions of [] individual[s] who [had] been persecuted." The immigration judge was troubled that Jimenez-Mateus and his wife "misrepresented themselves as tourists"; Jimenez-Mateus left his wife and son in Colombia for a year with the possibility that "they could be shot or substantially harmed"; and Jimenez-Mateus and his wife returned to Colombia after they escaped to the United States.

The Board dismissed Jimenez-Mateus's appeal. The Board "adopt[ed] and affirm[ed]" the rulings by the immigration judge that Jimenez-Mateus failed to "adequately corroborate[] his claim" or "demonstrate[] past persecution or a well-founded fear of persecution in Colombia." The Board "specifically concur[red] in the . . . finding that it [was] unlikely that [Jimenez-Mateus] would return to Colombia . . . , as he did after trips to the United States in December 2002, November 2003, and October 2005, after the events in Colombia which form[ed] the basis of his persecution claim."

10

## II. STANDARD OF REVIEW

Our standard of review is highly deferential. Mohammed v. U.S. Att'y Gen., 547 F.3d 1340, 1345 (11th Cir. 2008). We review the decision of the Board to determine whether it is "'supported by reasonable, substantial, and probative evidence on the record considered as a whole.'" Id. at 1344 (quoting Al Najjar v. Ashcroft, 257 F.3d 1262, 1284 (11th Cir. 2001)). To reverse those findings of fact, we must find that the record "'compels a reversal; the mere fact that the record may support a contrary conclusion is not enough to justify a reversal of the administrative findings.'" Id. (quoting Adefemi v. Ashcroft, 386 F.3d 1022, 1027 (11th Cir. 2004)). Because the Board adopted the findings of the immigration judge, we review the decision of the immigration judge. Al Najjar, 257 F.3d at 1284.

## III. DISCUSSION

Jimenez-Mateus challenges the denial of his application on two grounds. Jimenez-Mateus argues that he provided a consistent and detailed account about his persecution to establish he suffered past persecution and had a well-founded fear of future persecution. Jimenez-Mateus also argues that he was denied a full and fair hearing before a neutral factfinder, but he did not present that argument to the Board. "[A]bsent a cognizable excuse or exception, we lack jurisdiction to consider claims that have not been raised before the [Board].'"

Amaya-Artunduaga v. U.S. Att'y Gen., 463 F.3d 1247, 1250 (11th Cir. 2006). We dismiss that portion of the petition challenging Jimenez-Mateus's removal hearing.

The record supports the findings that Jimenez-Mateus did not suffer past persecution and does not have a well-founded fear of future prosecution on account of his political opinion. According to Jimenez-Mateus, he was threatened on four occasions and members of the Revolutionary Armed Forces followed him from a meeting because he supported Uribe and his policies, but threats and harassment do not constitute persecution. See Sepulveda v. U.S. Att'y Gen., 401 F.3d 1226, 1231 (11th Cir. 2005) ("[M]ere harassment does not amount to persecution."). Jimenez-Mateus was never physically harmed. See Silva v. U.S. Att'y Gen., 448 F.3d 1229, 1238 (11th Cir. 2006). Jimenez-Mateus's accounts contained inconsistencies, and he failed to provide any information to corroborate his encounters with the Revolutionary Armed Forces or the telephone calls, even though his wife was available to testify. Jimenez-Mateus also failed to prove a well-founded fear of future persecution because his wife and son remained in Colombia for a year after the threats without incident, Jimenez-Mateus traveled safely to Colombia three times after he was threatened, and his father and mother have remained in Colombia unharmed.

## IV. CONCLUSION

We **DENY** Jimenez-Mateus's petition.

**PETITION DENIED.**