[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JANUARY 5, 2010
JOHN P. LEY
ACTING CLERK

No. 09-11000
Non-Argument Calendar

_____

Agency No. A095-885-500

AISHA ABDALLA BWALU,

Petitioner,

versus

U.S. ATTORNEY GENERAL,

Respondent.

_____

Petition for Review of a Decision of the
Board of Immigration Appeals

_____

(January 5, 2010)

Before EDMONDSON, BIRCH and FAY, Circuit Judges.

PER CURIAM:

Aisha Abdalla Bwalu, a native and citizen of Tanzania, petitions us for

review of the Board of Immigration Appeals' ("BIA") decision affirming the

Immigration Judge's ("IJ") order denying her application for asylum and

withholding of removal under the Immigration and Nationality Act ("INA") and

relief under the United Nations Convention Against Torture and Other Cruel,

Inhuman or Degrading Treatment or Punishment ("CAT"). Because the BIA

failed to consider additional documentary evidence submitted by Bwalu in support

of her application, we GRANT the petition and REMAND to the BIA with

instructions to evaluate her claim for relief in light of this evidence.

## I. BACKGROUND

Bwalu, a native and citizen of Tanzania, applied for asylum, withholding of

removal, and CAT relief based on political opinion and membership in a particular

social group on 18 June 2002.[1] Administrative Record ("AR") at 218-28. Bwalu

alleged in her application that in 1999 she joined the Civic United Front ("CUF"),

a political party whose goal was to "fight the corruption of the government [in] a

peaceful way." Id. at 227. She stated that on 26-27 January 2000, Tanzanian

police fired into an organized CUF street demonstration, killing fifty-six people,

including three of her friends. Id. Two days later, the police entered her house,

beat her children, and beat her nearly to death. Id. Bwalu subsequently testified

---

[1] The record reflects that Bwalu's application, although signed on 18 June 2002, was filed on 5 July 2002. Id. at 218, 225.

2

during her removal proceedings that she prepared her own asylum application in Swahili and later had it translated into English. Id. at 77-78. During a 28 January 2005 interview with an asylum official, Bwalu made fifteen miscellaneous changes to her asylum application, including, inter alia, the addition of an allegation that "Tanzania police beat her once [at] her house regarding her activities [with] CAF [sic]." Id. at 218-23; see also id. at 129.

The United States Citizenship and Immigration Services ("CIS") served Bwalu with a Notice to Appear ("NTA") in February 2005, charging her with entering into the United States without inspection by an Immigration Officer. Id. at 250-51. At an initial hearing before an IJ, Bwalu admitted the allegations in the NTA and conceded removability. Id. at 63.

On 26 June 2006, Bwalu filed an amended statement in support of her asylum application in which she alleged that after she fled the January 2000 street demonstration, five members of the Chama Cha Mapinduzi ("CCM") political party captured, raped, and beat her nearly to death. Id. at 209-11. Bwalu attached to her amendment a 26 January 2000 police report, which stated that Bwalu was raped by unknown individuals "believed to have political motivation[s]." Id. at 214. Bwalu also included a 2 May 2006 statement from the CUF confirming that she had been an "active member of [the] party . . . since 2-7-1999." Id. at 216.

Bwalu amended her statement once more prior to her 17 April 2007 removal

3

hearing.  Id. at 174-75.  In this statement, Bwalu again recounted her 26 January 2000 rape and alleged additionally that:  (1) CCM threatened to beat and kill her on five separate occasions; (2) members of CCM attacked her twice; and (3) she went into hiding for several years.  Id. at 176.  Bwalu further stated that she feared she would be killed by CCM if she returned to Tanzania.  Id.

At her removal hearing, Bwalu testified that in January 2000, she attended a campaign rally in support of the CUF presidential candidate who was running in the upcoming October 2000 election.  Id. at 113-14.  Six hundred people, including members of both CUF and the ruling party, CCM, were present.  Id. at 113, 115.  As the CUF candidate was addressing the crowd, members of CCM disrupted the meeting and called the police.  Id. at 115-16, 122.  In the chaos that ensued, CCM "police," armed with guns, opened fire and killed fifty-six people.  Id. at 115, 122.  Bwalu testified that between three and five of these policemen captured her, raped her, and left her unconscious.  Id. at 116, 121.  After being discovered by some passers-by, she was taken to the hospital, where doctors checked her "private parts" and treated her with antibiotics.  Id. at 116-18, 125.  Later that evening, Bwalu went to the police and reported the rape.  Id. at 125.  When asked why she reported the incident to the police if it was the police who had raped her, Bwalu responded that there were two different groups of police – the "FFU, that kill people, and . . . the other police."  Id. at 123.

Bwalu testified that she remained in Tanzania for two years after her rape because she lacked funds to leave. Id. at 119, 124. During this time, CCM members continued to look for her. Id. at 119-21. Bwalu stated that she could not return to Tanzania because the CCM would beat her and "probably . . . kill [her]." Id. at 121. She further stated that she believed she would be tortured if she returned because CCM had tortured, beaten, and raped her before, and because she had been told that other people who had returned in 2005 had been tortured and even killed by CCM. Id.

In response to the IJ's concern that Bwalu failed to include the rape incident in her original asylum application, Bwalu, through counsel, stated that her application had been completed "by a non-lawyer" and "was not properly prepared." Id. at 137. Bwalu further explained that she did not disclose the rape to the asylum officer during the interview because she "went to [the] interview by [her]self without a lawyer," "wasn't very fluent in English," and "was very ashamed." Id. at 137, 139.

In support of her claim for relief, Bwalu submitted into evidence the 2005 and 2006 Tanzanian Country Reports. The 2005 report explained that because 2005 was a presidential election year, government harassment of political opposition parties had increased. Id. at 183. The report documented instances of security forces firing tear gas and live ammunition at CUF supporters in order to

5

disperse political demonstrations.  Id. at 185, 191-92.  The 2006 Country Report

stated that although harassment of political parties significantly decreased in 2006,

"rape continued to be a serious problem."    Id. at 161, 165.

In an oral decision, the IJ denied relief after making an explicit adverse

credibility determination based on Bwalu's failure to mention in her initial asylum

application or during the subsequent asylum interview that she had been raped by

CCM police.  Id. at 54-55.   On appeal, the BIA rendered its own decision

upholding the IJ's adverse credibility determination and finding that Bwalu's

explanations for failing to disclose her rape were implausible.  Id. at 2-3.

Specifically, the BIA noted that Bwalu's claim that she was embarrassed and

ashamed was belied by her testimony that she reported the rape to Tanzanian

police immediately after it happened.  Id.  The BIA further noted that Bwalu

blamed the omission on the person who prepared her asylum application, yet had

testified that she prepared her own asylum application.  Id. at 3.  The BIA

concluded that "[b]ecause the central evidence of a threat to [Bwalu] depended on

her credibility," the adverse credibility determination precluded her from satisfying

the burden of proof necessary for establishing eligibility for asylum or the more

stringent burden of proof associated with withholding of removal.  Id.  With

respect to Bwalu's CAT claim, the BIA found that it likewise failed to the extent

that it was predicated on the same central facts as her asylum and withholding of

6

removal claims.  Id.  The BIA held alternatively that CAT relief was due to be denied because there was no evidence that Bwalu faced a clear probability of torture if returned to Tanzania.  Id.  This appeal followed.

## II. DISCUSSION

On appeal, Bwalu argues that the BIA erred in relying solely on its adverse credibility determination, without considering the additional documentary evidence she submitted, in denying her application for relief.

Where, as here, the BIA issues its own decision and does not expressly adopt the IJ's decision or reasoning, we review the BIA's decision only.  See Zhang v. U.S. Att'y Gen., 572 F.3d 1316, 1319 (11th Cir. 2009) (per curiam).  We review legal conclusions de novo and factual findings, including credibility determinations, under the substantial evidence test, which requires us to affirm the BIA's decision if it is "supported by reasonable, substantial, and probative evidence on the record considered as a whole."  Forgue v. U.S. Att'y Gen., 401 F.3d 1282, 1286 (11th Cir. 2005) (quotation marks and citation omitted).  Under this highly deferential standard, we view the record in the light most favorable to the BIA's decision and are bound by that decision unless a reasonable adjudicator would be compelled to conclude to the contrary.  See Adefemi v. Ashcroft, 386 F.3d 1022, 1026-27 (11th Cir. 2004) (en banc).

To establish eligibility for asylum, the applicant must, with credible

evidence, demonstrate that he was (1) persecuted in the past on account of race, religion, nationality, membership in a particular social group, or political opinion; or (2) has a well-founded fear of future persecution on account of a statutorily-protected ground.  See 8 U.S.C. § 1101(a)(42)(A); 8 C.F.R. § 208.13(a), (b); see also Chen v. U.S. Att'y Gen., 463 F.3d 1228, 1231 (11th Cir. 2006) (per curiam).[2]

An applicant's testimony, if credible, may be sufficient, without corroboration, to sustain this burden.  See 8 U.S.C. § 1158(b)(1)(B)(ii); 8 C.F.R. § 208.13(a).  On the other hand, an adverse credibility determination alone is sufficient to support the denial of relief, especially where the applicant produces no evidence other than her own testimony.  Forgue, 401 F.3d at 1287.  Where the applicant does produce other evidence of persecution, however, the BIA must consider that evidence and may not rely solely on an adverse credibility determination to deny relief.  See id. (explaining that "an adverse credibility determination does not alleviate the [BIA]'s duty to consider other evidence

---

[2] To establish eligibility for withholding of removal under the INA, an applicant must demonstrate that it is "more likely than not" that she will be persecuted upon returning to her home country on account of a protected ground.  Fahim v. U. S. Att'y Gen., 278 F.3d 1216, 1218 (11th Cir. 2002) (per curiam) (quotation marks and citation omitted).  Because "[t]his standard is more stringent than the well-founded fear of future persecution required for asylum," Tan v. U.S. Att'y Gen., 446 F.3d 1369, 1375 (11th Cir. 2006) (quotation marks and citation omitted), an applicant who fails to establish eligibility for asylum is generally precluded from qualifying for withholding of removal, see Al Najjar v. Ashcroft, 257 F.3d 1262, 1292-93 (11th Cir. 2001).

produced by an asylum applicant"); see also Mohammed v. U.S. Att'y Gen., 547 F.3d 1340, 1347 (11th Cir. 2008) (noting IJ's obligation to consider petitioner's documentary evidence).

In this case, Bwalu produced evidence other than her testimony in support of her asylum application, including country reports detailing political turmoil and incidents of violence between the CUF and CCM, a letter confirming Bwalu's CUF membership, and, most significantly, a police report stating that Bwalu was raped on 26 January 2000 by individuals with political motivations. The BIA failed to refer to, let alone evaluate, this documentary evidence and instead relied solely on its adverse credibility determination to deny relief. This was error. See Forgue, 401 F.3d at 1287. Because the police report, if authenticated, would corroborate Bwalu's testimony that she was raped on the day of the January 2000 demonstration, and because the BIA based its adverse credibility determination exclusively on Bwalu's failure to include the rape in her initial asylum application, we remand to the BIA for reconsideration of its credibility determination in light of this corroborating evidence. See, e.g., Zhang, 572 F.3d at 1320 (vacating BIA's order denying petitioner's motion to reopen where "BIA's decision overlooked . . . other record evidence that corroborate[d] [petitioner]'s claim"); Gui Cun Liu v. Ashcroft, 372 F.3d 529, 531-35 (3d Cir. 2004) (remanding to BIA for reconsideration of credibility issue where IJ did not make any reference to abortion

9

certificates that, if genuine, would have corroborated petitioner's testimony).

## III. CONCLUSION

Bwalu petitions us for review of the BIA's decision denying her claims for relief under the INA and the CAT. For the foregoing reasons, we GRANT Bwalu's petition for review, VACATE the decision of the BIA, and REMAND for further proceedings consistent with this opinion.

**PETITION GRANTED; VACATED AND REMANDED.**